No. 95-472

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

IN THE MATTER OF D.D.,

      Respondent and Appellant.

FILED

JUN 28 1996

Ed Smith

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Russell G. Fagg, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

         Terry L. Seiffert, Billings, Montana

      For Respondent:

         Honorable Joseph P. Mazurek, Attorney General;
Cregg W. Coughlin, Assistant Attorney General,
Helena, Montana

         Dennis Paxinos, County Attorney, Billings, Montana

Submitted on Briefs:  April 25, 1996

Decided:  June 28, 1996

Filed:

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

D.D. was committed to the Montana State Hospital at Warm Springs by order of the Thirteenth Judicial District Court, Yellowstone County. D.D. appeals. We affirm.

The issues are:

1. Was there sufficient evidence of an overt act to find D.D. seriously mentally ill?

2. Did the District Court err in entering an order of commitment without making findings of fact and conclusions of law?

In June 1995, D.D. asked officers from the Billings, Montana police department to come to his apartment because of his concerns about other people in his apartment building. When the officers arrived at D.D.'s apartment, they found papers in the oven, the timer for the oven turned on, and the smoke detector in the kitchen turned off or disabled. D.D. objected to inspection of his stove and apartment by the local fire department. A police officer took D.D. to a hospital emergency room for psychiatric evaluation.

In the emergency room, it was determined that D.D. was suffering from delusions and hallucinations. D.D. was examined by Dr. Paul Gordon, a Billings psychiatrist. Dr. Gordon diagnosed D.D. as a chronic paranoid schizophrenic.

D.D. told Dr. Gordon that a gang leader, whom he was unable to further identify, wanted D.D. to be "his wife and his whore" and was going to force D.D. to do that. D.D. told Dr. Gordon that the gang leader would beat D.D. in the head with a hammer until D.D. was dead or became the gang leader's wife. D.D. opined to Dr. Gordon that the gang leader "should be treated like a rabid dog."

2

D.D. also told Dr. Gordon that he heard an unseen couple in his apartment building saying they were going to rape him.

Dr. Gordon testified at D.D.'s commitment hearing that D.D. is a potential danger to himself and others. He stated that D.D. could attack somebody because D.D. believes he is about to be attacked. D.D. has a history of mental illness, and an attempt to treat him locally a year before had not worked out. D.D. had refused to take medication prescribed to control his delusions. Dr. Gordon recommended that D.D. be committed for treatment and that the state hospital be authorized to administer medications to D.D. even against his will, if the hospital deemed it necessary.

D.D. also testified at his commitment hearing. He stated that he had placed papers relating to an herbal weight loss product in his oven because he believed his apartment had been entered without him knowing it. He testified:

> Most thieves wouldn't think a weight loss product or a pill would be in an oven.
>
> . . . .
>
> . . . I told Dr. Gordon and the police, and I told you, I was trying to identify a psychotic or psychopathic killer in our community. I wasn't doing anything wrong. I wasn't acting in an irrational manner. I stood there. I was talking to the officer. Sure I was nervous. There were five firemen over there accusing me of trying to start fire or being incompetent to the point where I accidentally started a fire, which I don't think was true. I had that stuff in that oven for more than a week, and in my own logical observation of myself, knowing what I'm doing is why I called the police about this person and the people in the apartment building.
>
> I also told Officer Cunningham, who brought me to the hospital, I told him I was having problems with somebody who was attacking me right there in my house.
>
> . . . .

3

I tried to identify the person, even tell him his name. For all I know he might be using my name, and I tried to bring my Montana State ID card with me, but it wasn't in my fanny pack that I carried to the hospital, so I couldn't find it, but the person that I'm talking about, who has been attacking me, will attack others either with guns or other material that will hurt them or even kill them.

D.D. further testified:

I haven't gone out looking for this person to attack him. I have been kind of halfway keeping an eye out for him to catch him in an act like I have been describing so I can help the police apprehend him.

In its order of commitment, the District Court found that D.D. had received the benefit of all applicable statutory and constitutional rights and was seriously mentally ill and in need of further evaluation and treatment. The court stated its finding was supported by Dr. Gordon's written report, which was attached to the order. The court ordered D.D. committed to the Montana State Hospital for treatment and evaluation for not more than three months unless extended pursuant to § 53-21-128, MCA (1991).

Issue 1

Was there sufficient evidence of an overt act to find D.D. seriously mentally ill?

In an involuntary commitment proceeding, the State must prove its case beyond a reasonable doubt with respect to any physical fact or evidence, and by clear and convincing evidence as to all other matters. Section 53-21-126(2), MCA. Our standard of review requires that we evaluate the evidence in a light most favorable to the prevailing party. Matter of R.J.W. (1987), 226 Mont. 419, 423, 736 P.2d 110, 112.

4

"Seriously mentally ill" is defined at § 53-21-102(15), MCA, as

> suffering from a mental disorder which has resulted in self-inflicted injury or injury to others or the imminent threat of injury or which has deprived the person afflicted of the ability to protect the person's life or health. For this purpose, injury means physical injury.

Evidence of actual violence or physical harm is not required to satisfy the provision "imminent threat of injury." Matter of F.B. (1980), 189 Mont. 229, 235, 615 P.2d 867, 870. However, imminent threat of self-inflicted injury or injury to others must be evidenced by overt acts sufficiently recent as to be material and relevant to the person's present condition. Section 53-21-126(2), MCA.

D.D. argues that there was no evidence of any overt act in which he was violent, threatening toward anyone, or suicidal. He contends that the only basis for his commitment were the papers he had placed in his oven.

While the danger must be fairly immediate, an overt act need not be a completed act; an attempt or threat, or even a failure to act, may suffice. F.B., 615 P.2d at 869. Police officers were summoned to the hotel in which F.B. lived because he was "loud and abusive and throwing food." F.B., 615 P.2d at 870. F.B. sat on his bed wielding a baseball bat and argued with the officers for several minutes before agreeing to go with them. This Court upheld F.B.'s commitment based upon these "overt acts." F.B., 615 P.2d at 870.

A threat to kill qualifies as an overt act. In re Mental Health of E.M. (1994), 265 Mont. 211, 213, 875 P.2d 355, 356.

5

E.M., a fifty-seven-year-old widow, was involuntarily committed after she told mental health professionals that she planned to buy a gun and then shoot her neighbor and herself. On appeal to this Court, E.M. argued that a physical act was needed to establish an overt act. This Court affirmed E.M.'s commitment based upon her verbal threats to kill herself and her neighbor.

In his written report to the Court, Dr. Gordon recounted that, during his conversations with D.D., D.D. came to the conclusion that Dr. Gordon was a pimp and that "there were political reasons for [Dr. Gordon's] going to court to have [D.D.] committed for treatment." Dr. Gordon stated that D.D. could "very easily" attack someone out of fear, anticipating that they were about to attack him. In the opinion of Dr. Gordon, a mental health professional, D.D. is a danger to himself and others in that he may attack someone due to his fear and paranoia that he is about to be attacked. We conclude that D.D.'s statements to Dr. Gordon, including his statement that the gang leader "should be treated like a rabid dog," constituted "overt acts."

Viewing the evidence in the light most favorable to the prevailing party, we conclude that the record contains clear and convincing evidence that D.D. was suffering from a mental disorder demonstrated by an overt act resulting in an imminent threat of injury to himself or others.

## Issue 2

Did the District Court err in entering an order of commitment without making findings of fact and conclusions of law?

6

Rule 52(a), M.R.Civ.P., requires that in all actions tried upon the facts without a jury "the court shall find the facts specifically and state separately its conclusions of law thereon." D.D. points out that the District Court merely found that he was seriously mentally ill and incorporated by reference the two-page letter from Dr. Gordon as the factual basis therefor.

The State's first response to this issue is that D.D. did not give the District Court notice that he desired more from the court in the way of findings of fact. Where the district court has not been given an opportunity to correct its error, this Court will not reverse on appeal. In re Marriage of Laster (1982), 197 Mont. 470, 481, 643 P.2d 597, 603.

Additionally, where the record as a whole establishes that a person's mental disorder has resulted in an imminent threat to the person and others, a district court's error in failing to set forth a detailed statement of the facts may constitute harmless error. R.J.W., 736 P.2d at 113. Although we do not recommend the shortcut method used by the District Court in this case, such is the case here. The record as a whole establishes that D.D.'s mental disorder resulted in an imminent threat to himself and to others, and supports the action taken by the District Court.

Affirmed.

J. A. Turnage
Chief Justice

7

We concur:

_____

_____

W. William Leaphart

_____

Justices

8

Justice James C. Nelson specially concurring.

I concur in our discussion of issue one and concur in our discussion of issue two to the extent that we should not consider this issue because no exceptions were made by D.D. to the manner in which the court made its findings. I do not agree that simply incorporating a doctor's report by reference fulfills the trial court's obligation under Rule 52(a), M.R.Civ.P., to "find the facts specially." Unfortunately decisions like this and Matter of R.J.W. (1987), 226 Mont. 419, 736 P.2d 110, establish exceptions that soon swallow the rule.

_____
                        Justice

9

Justice Terry N. Trieweiler dissenting.

I dissent from the majority's conclusion that there was clear and convincing evidence that D.D. was seriously mentally ill. Proof of serious mental illness requires proof that a person is an imminent threat of injury to himself or others. Section 53-21-102(15) MCA. "Imminent threat of self-inflicted injury or injury to others shall be evidenced by overt acts, sufficiently recent in time as to be material and relevant as to the respondent's present condition. Section 53-21-126(2), MCA.

While we have held in *Mental Health of E.M.* (1994), 265 Mont. 211, 875 P.2d 355, that a direct threat to kill another satisfies the overt act requirement, the majority's conclusion in this case simply stretches the "overt act" requirement beyond the point that it has any meaning.

There was nothing about referring to Dr. Gordon as a pimp, or the fact that disparaging remarks were made about a gang leader that suggested that D.D. was an imminent threat of harm to himself or others. Rush Limbaugh and G. Gordon Liddy say worse things to millions of listeners every day.

While there may be a strong public policy argument that an overt act should not be required before concluding that a person presents an imminent threat of harm to himself or others, that public policy decision has been made by the Legislature and should

10

be amended by the Legislature. For all practical purposes, § 53-21-126(2), MCA, has been amended by this decision.

For these reasons, I dissent from the majority opinion.

_____
Justice

11