No. 04-734

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 152

IN THE MATTER OF THE

MENTAL HEALTH OF D.S.,

Respondent and Appellant.

APPEAL FROM:     District Court of the Eighteenth Judicial District,
                 In and for the County of Gallatin, Cause No. DI 2004-22,
                 The Honorable Mike Salvagni, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Kirsten Mull Core, Attorney at Law, Bozeman, Montana

        For Respondent:

        Hon. Mike McGrath, Attorney General; Jim Wheelis,
        Assistant Attorney General, Helena, Montana

        Marty Lambert, County Attorney; Eric Kitzmiller, Deputy County Attorney,
        Bozeman, Montana

                                        Submitted on Briefs: May 17, 2005

                                        Decided:   June 14, 2005

Filed:

        _____
                            Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     D.S. appeals from an order of the Eighteenth Judicial District Court, Gallatin County, involuntarily committing him to the Montana State Hospital (Hospital) for treatment. We affirm in part and remand in part.

¶2     D.S. raises the following issues on appeal:

¶3     1.   Whether the District Court found on clear and convincing evidence that D.S. suffered from a mental disorder beyond a reasonable medical certainty.

¶4     2.   Whether the District Court placed D.S. in the least restrictive environment necessary to permit effective treatment and protect both D.S. and the public.

BACKGROUND

¶5     When Sheriff Dan Springer (Sheriff Springer) delivered a temporary restraining order filed by K.M., D.S.'s ex-girlfriend, D.S. threatened to kill himself and leave a note on his chest telling K.M. "thanks a lot." Sheriff Springer placed D.S. under protective custody based on these suicidal statements. John Karath (Karath), a licensed clinical social worker, evaluated D.S. and determined that D.S. suffered from a mental illness–Mood Disorder, NOS–and recommended that D.S. be detained and held at the Hospital because D.S. posed an imminent danger to himself. D.S. told Karath that the only thing that kept D.S. from killing himself that day was not having enough gas in the tank. D.S. also declared that he needed to finish an excavating job for a friend that would delay his suicide for at least one week. D.S. also claimed that a number of people connected to a "meth ring" conspired to keep him and K.M. apart, including having him committed to the Hospital to silence him.

2

¶6    The State filed a petition, pursuant to § 53-21-121, MCA, based on Karath's report to have D.S. committed to the Hospital. The District Court found probable cause that D.S. suffered from a mental disorder and required treatment, appointed an attorney to represent D.S., and set a hearing.

¶7    The District Court appointed Amy Rue (Rue), a licensed clinical professional counselor and a representative of the Gallatin County Medical Health Clinic, pursuant to § 53-21-123, MCA, as the professional person to examine D.S. and make a recommendation concerning D.S.'s mental health status. Rue evaluated D.S. for one hour directly before the hearing. Rue read the petition and Karath's report and she also spoke on the phone with a person who called with information about D.S. D.S. reiterated to Rue that he had contemplated suicide because he was despondent about breaking up with K.M. and that a "meth ring" was out to get him.

¶8    The District Court held a hearing on July 26, 2004, where Rue testified that D.S. "definitely appears to be paranoid" and that D.S. may pose a danger to himself and others if the State released him from protective custody. Rue also testified that she had diagnosed D.S. as suffering from Delusional Disorder, NOS based on his significant pre-occupation with the "meth ring" conspiring against him and "trying to keep him quiet." D.S. believed, according to Rue, that several people were "alienated from him due to his involvement with the drug task force trying to get people put in prison."

¶9    Rue acknowledged that even if she could not state with entire certainty the disorder from which D.S. suffered, that in her opinion, to a reasonable degree of medical certainty,

3

D.S. suffered from a mental disorder that required commitment. Rue conceded that she had not confirmed, or investigated, the "meth ring" or whether any conspiracy truly existed. She based her opinion, however, on D.S.'s strong preoccupation with the "meth ring" conspiracy in conjunction with his suicidal tendencies. Rue concluded that regardless of whether a conspiracy existed, D.S. still felt despondent and suicidal about his perceived failed relationship with K.M. and "[t]hat situation doesn't seem to be going away."

¶10 Rue finally testified that when determining whether someone should be placed at the Hospital or in a group home setting, her recommendation depends on whether "someone is stabilizing at the hospital. . . . then sometimes it appears it's appropriate to get them just in supervised setting to continue that stabilization process here in the community." Rue conceded that she had not spoken with anyone at the Hospital to determine whether D.S. appeared to be stabilizing.

¶11 The District Court concluded that it would take further investigation to determine the validity of the conspiracy ring. The court's inquiry focused instead on D.S.'s statements of suicidal thoughts. The District Court found that proof existed that D.S. suffered from a mental disorder and required treatment and committed D.S. for a period not to exceed three months at the Hospital. The District Court also concluded that the Hospital administrator could discharge D.S. into an appropriate community program if the administrator believed D.S.'s condition had improved. D.S. appeals his involuntary commitment.

STANDARD OF REVIEW

¶12 We review the sufficiency of the evidence in civil commitment proceedings in a light

4

most favorable to the prevailing party and do not disturb a district court's findings of fact unless they are clearly erroneous. *In re Mental Health of C.R.C.*, 2004 MT 389, ¶ 11, 325 Mont. 133, ¶ 11, 104 P.3d 1065, ¶ 11 (citations omitted). When reviewing the district court's conclusions of law, we merely determine whether its decision was correct. *Matter of Mental Health of L.C.B.* (1992), 253 Mont. 1, 5, 830 P.2d 1299, 1302.

## DISCUSSION

## ISSUE ONE

¶13     Whether the District Court found on clear and convincing evidence that D.S. suffered from a mental disorder beyond a reasonable medical certainty.

¶14     D.S. contends that the District Court clearly erred in committing him to the Hospital because the State did not provide clear and convincing evidence that D.S. suffered from a mental disorder beyond a reasonable medical certainty pursuant to § 53-21-126(2), MCA. We disagree. We note at the outset that D.S. did not testify himself and that he did not call any witnesses to testify on his behalf in order to undermine the State's contentions in this matter.

¶15     A court in a civil commitment proceeding first must determine that the respondent suffers from a mental disorder, and next, determine that the respondent requires commitment. Section 53-21-126(1), MCA. The State must prove that respondent requires commitment because his recent and relevant overt acts and omissions pose an imminent threat of self-inflicted injury or injury to others. Section 53-21-126(2), MCA. "Imminent threat of injury" can be shown without evidence of actual violence or physical harm. *Matter of D.D.* (1996),

5

277 Mont. 164, 168, 920 P.2d 973, 975; Section 53-21-126(2), MCA. Such threat of injury, however, must be evidenced by overt acts sufficiently recent as to be material and relevant to the person's present condition. *D.D.*, 277 Mont. at 168, 920 P.2d at 975; Section 53-21-126(2), MCA. An overt act need not be a completed act, and "an attempt or threat, or even a failure to act, may suffice." *D.D.*, 277 Mont. at 168, 920 P.2d at 975 (citation omitted). An overt act can be evidenced by a present indication of probable physical injury which is likely to occur at any moment or in the immediate future. *Matter of C.M.* (1981), 195 Mont. 171, 173-74, 635 P.2d 273, 274; *C.R.C.*, ¶ 22.

¶16 Here D.S. first related his suicidal thoughts to Sheriff Springer. D.S.'s suicidal thoughts caused the Sheriff to place D.S. under protective custody. D.S. then repeated his suicidal statements and added his conspiracy theories about the "meth ring" to Karath, the first evaluator. This evaluation resulted in Karath's diagnosis that D.S. suffered from a mental illness along with Karath's recommendation that D.S. be detained and held at the Hospital because D.S. posed an imminent danger to himself. D.S. again reiterated his suicidal aspiration, despondent feelings, and claims about the "meth ring" conspiracy to the court-appointed evaluator, Rue, who diagnosed D.S. as delusional and paranoid and recommended that D.S. be committed to the Hospital. We conclude that under these circumstances the District Court correctly determined that D.S. seriously contemplated suicide under the influence of a mental disorder and that he posed an imminent danger to himself.

¶17 As for proof of D.S.'s mental illness, the State presented testimony that D.S.

6

continued to want a relationship with K.M. who clearly did not want a relationship. Rue conceded that she could not confirm the validity of D.S.'s fears about the "meth ring" conspiracy and its alleged attempts to block D.S.'s relationship with K.M. The condition that produced D.S.'s thoughts of suicide, however, wanting a relationship with K.M. – lingered. Rue testified that D.S. likely would continue feeling despondent and that he would be unable to focus on other matters until that situation had been resolved. Rue concluded to a reasonable degree of medical certainty that D.S. had a medical disorder requiring commitment because of his suicidal notions. The District Court related that D.S.'s "suicidal thoughts were serious enough for him to be brought to the attention of the Court and the Court is concerned that if there's not some intervention here that the thought [of suicide] may become reality and he may kill himself and I'm not convinced here that that wouldn't happen."

¶18    We conclude that the record, when viewed in the light most favorable to the prevailing party, contains clear and convincing evidence that D.S. suffered from a mental disorder beyond a reasonable medical certainty. D.S.'s mental disorder, as demonstrated by his several overt acts of relating suicidal thoughts to anyone who would listen, resulted in an imminent threat of danger at least to himself. The Court in *In re Mental Health of E.M.* (1994), 265 Mont. 211, 214, 875 P.2d 355, 357, affirmed E.M.'s commitment based upon her overt acts of making repeated verbal threats to obtain a gun and kill herself and her neighbor. Similarly in *Matter of F.B.* (1980), 189 Mont. 229, 235, 615 P.2d 867, 870, we affirmed F.B.'s commitment based upon his overt acts of being loud, abusive, throwing food,

7

and sitting on his bed wielding a baseball bat while arguing with police officers. *See also D.D.*, 277 Mont. at 168-69, 920 P.2d at 975 (holding that D.D.'s statements to the professional person constituted overt acts); *but see, C.R.C.*, ¶ 23 (concluding that C.R.C.'s statement that "if she had a gun she had shot somebody" did not constitute an overt act because she did not demonstrate an intent or ability to shoot someone). D.S. repeated his intent to commit suicide to Sheriff Springer and two separate evaluators. This type of behavior constitutes overt acts from which the District Court properly found that D.S. suffered from a mental illness and needed treatment. *E.M.*, 265 Mont. at 214, 875 P.2d at 357.

## ISSUE TWO

¶19 Whether the District Court placed D.S. in the least restrictive environment necessary to permit effective treatment and protect both D.S. and the public.

¶20 The District Court found that D.S. suffered from a mental disorder, required treatment, and committed D.S. for a period not to exceed three months at the Hospital. D.S. argues that the District Court did not address whether the Hospital represented the least restrictive environment in which to treat him. We agree simply for the reason that the District Court did not make a "detailed statement of facts upon which the court found the respondent to be suffering from a mental disorder and requiring commitment" as required by § 53-21-127(8), MCA.

¶21 The State urges us to take the court's remark at the hearing that it "had no other option" to mean that the District Court considered the facilities available. Although the court

8

may have understood that other alternatives existed, an oral pronouncement during a hearing cannot overcome the District Court's requirement to make findings that include, among other things, alternative environments available for D.S.'s treatment, its consideration of those alternatives for D.S.'s treatment, and the reason that it determined those alternatives to be unsuitable for D.S. Section 53-21-127(8), MCA. The District Court failed in its obligation to provide such findings. We therefore remand for a determination, complete with detailed findings of fact, of the least restrictive environment needed to permit effective treatment and to protect D.S. pursuant to § 53-21-127(5) and (8), MCA.

¶22    Affirmed in part and remanded in part.


                                        /S/ BRIAN MORRIS

We Concur:

/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE

Justice Patricia O. Cotter dissents.

¶23    I dissent.

¶24    In *Mental Health of C.R.C.*, we quoted from our Opinion in *In re Mental Health of E.M.* (1994), 265 Mont. 211, 213, 875 P.2d 355, 356-57, saying:

> we have recognized . . . that commitment is required "when there is proof beyond a reasonable doubt that there is a present indication of probable physical injury likely to occur at any moment or in the immediate future, *coupled with the finding* . . . that the individual is suffering from a mental disorder."

*C.R.C.*, ¶ 22 (emphasis added).

10

¶25 Here, the Court concludes at ¶ 18 as follows:

> D.S.'s mental disorder, as demonstrated by his several overt acts of relating suicidal thoughts to anyone who would listen, resulted in an imminent threat of danger at least to himself.

Basically, what we have concluded here is that D.S.'s mental disorder exists because he has suicidal thoughts, rather than concluding that he both has a mental disorder and that there is in conjunction with the disorder an imminent threat of self-inflicted injury demonstrated by overt acts.

¶26 Rue's initial diagnosis was "delusional disorder, NOS (not otherwise specified)." However, when questioned about the diagnosis, Rue admitted that she had not been able to conduct a sufficient investigation to determine whether D.S.'s "delusions" arising out of the "meth ring conspiracy" had any basis in fact or reality. She said unequivocally that her evaluation of him was not complete, having taken place for only an hour prior to the hearing, and that she would like to have more certainty about his mental disorder. She further admitted that if his preoccupation with the drug conspiracy and his fear of the people involved in it were valid or true, then her diagnosis would be wrong. However, she then went on to opine that D.S. had a mental disorder connected with his threats of suicide. And it was this "mental disorder connected with threats of suicide" that the court relied upon in determining that D.S. should be committed.

¶27 As the Court points out, there must be a determination that the person to be committed suffers from a mental disorder beyond a reasonable medical certainty pursuant to § 53-21-126(2), MCA. See ¶ 14 above. Presumably, a reasonable medical certainty that a disorder

11

existed would encompass a medical determination of the nature of the disorder. Not so here. Rue could not specify what the disorder might be; in fact, she agreed with the District Court that, while she was not entirely certain of the name of the disorder, she was nonetheless certain that D.S. had one that required commitment. With all due respect, nothing reasonably medically certain whatsoever could be gleaned from Rue's testimony.

¶28 Further, even if there was a determinable mental disorder here, there was a total failure of "proof beyond a reasonable doubt that there is a present indication of probable physical injury likely to occur at any moment or in the immediate future . . . ." *C.R.C.*, ¶ 22. In fact, Rue admitted under cross-examination that D.S. told her he had decided against suicide. She also admitted that he expressed the belief that suicide was not a good idea or a solution to his problems. D.S. told Rue that, while he had made previous statements about suicide, the counselor who first interviewed him had taken them out of context. Further, although Rue recommended that he be given medication against his will, she had to admit that D.S. had given no indication that he was not willing to take medication nor did he evidence any unwillingness to address any psychological issues which he might have. In short, there was little proof, much less proof beyond a reasonable doubt, of any overt act that posed an imminent threat of self-inflicted injury, as required by § 53-21-126(2), MCA.

¶29 In *Mental Health of C.R.C.,* we acknowledged the "calamitous effect of a commitment," which include the loss of liberty and damage to the individual's reputation. We observed that it is because of these dire effects that the mental health statutes must be

12

strictly construed. *C.R.C.*, ¶ 13. In my judgment, these statutes were not strictly construed when the court, in reliance upon uncertain medical evidence--both as to the existence of a mental disorder and the probability of imminent self-inflicted injury--committed D.S. against his will for ninety days. I therefore dissent.

/S/ PATRICIA O. COTTER

Justice James C. Nelson joins in the dissent of Justice Patricia O. Cotter.

/S/ JAMES C. NELSON

Chief Justice Karla M. Gray joins in the dissent of Justice Patricia O. Cotter.

/S/ KARLA M. GRAY

13