# IN THE MATTER OF THE MENTAL HEALTH OF A.S.B.

No. DA 06-0687.
Submitted on Briefs August 15, 2007.
Decided March 11, 2008.
2008 MT 82.
342 Mont. 169.
180 P.3d 625.

For Appellant: **Nicholas Aemisegger, Jr.**, and **Greg Hood**, Kalispell Public Defender Office, Kalispell.

For Appellee: **Honorable Mike McGrath**, Attorney General; **Tammy K. Plubell**, Assistant Attorney General, Helena; **Ed Corrigan**, County Attorney; **Daniel M. Guzynski**, Deputy County Attorney, Kalispell.

JUSTICE RICE delivered the Opinion of the Court.

¶1 Appellant A.S.B. was involuntarily committed to the Montana State Hospital after a hearing in the Eleventh Judicial District Court, Flathead County. The District Court concluded that A.S.B. suffered from a mental disorder which was likely to deteriorate to a point where A.S.B. would pose a threat to himself and others. The District Court also concluded that A.S.B.'s mental disorder created an imminent threat of injury to himself or others. A.S.B. appeals the order committing him to the Montana State Hospital. We affirm.

¶2 We address the following issues on appeal:

¶3 1. Is the "deterioration standard" contained in § 53-21-126(1), MCA, unconstitutional?

¶4 2. If the "deterioration standard" is constitutional, did the District Court err by finding that A.S.B.'s mental condition will, if left untreated, deteriorate to a point where A.S.B. will pose a threat to himself or others?

¶5 3. Did the District Court err by finding that, due to a mental disorder, A.S.B. poses a risk of imminent harm to himself or others?

¶6 4. Did the District Court err by attaching and incorporating into its order a written report which was not admitted at the adjudicatory hearing, and if so, was it harmless error?

## FACTUAL AND PROCEDURAL BACKGROUND

¶7 The Whitefish Police Department and A.S.B. are very familiar with each other. Over a three-year period ending with A.S.B.'s commitment, local law enforcement had approximately thirty contacts with A.S.B., most of which related to reports of suspicious activity. Indeed, A.S.B. was living out of his truck for most of that time, and often parked near homes and businesses for extended periods of time, causing the residents concern. Although A.S.B.'s activities were normally innocent, Whitefish police would keep an eye on him to make

sure he knew they were watching him.

¶8 On August 30, 2006, Whitefish police officer Douglas Blalack was driving through the Super One parking lot in Whitefish on a routine patrol when he noticed A.S.B. approaching the store. As he watched A.S.B., Officer Blalack believed he saw A.S.B. throw something at Officer Blalack's vehicle, prompting him to approach A.S.B., roll down his window, and inquire what was going on. A.S.B. became aggressive and upset, and accused Officer Blalack of "starting something with him." When Officer Blalack asked A.S.B. what he had thrown at his car, A.S.B. denied throwing anything, and threatened Officer Blalack that he and the Whitefish Police Department "had better watch out ... because this was going to come to an end and it was going to happen soon." Officer Blalack interpreted A.S.B.'s statement as a threat; A.S.B. later testified he was merely expressing his intent to file an official complaint or lawsuit against the police department for harassing him. Officer Blalack called for a backup unit as A.S.B. began walking away, and continued to watch A.S.B. through his rearview mirror. A.S.B. then yelled several profanities in Officer Blalack's direction in the presence of a crowd that included children, after which the backup officer arrived and arrested A.S.B. for disorderly conduct.

¶9 The incident that led to A.S.B.'s arrest was not the first interaction between Officer Blalack and A.S.B. According to Officer Blalack, A.S.B. used aggressive and intimidating body language, eye contact, and words in every contact the two men had with each other, which included more than ten investigations by Officer Blalack into reports of suspicious activity by A.S.B. On at least three such occasions Officer Blalack, knowing that A.S.B. had a knife on his person, was compelled to draw his weapon when A.S.B. refused to comply with a request that he keep his hands in plain sight. Moreover, A.S.B. had on one occasion disrupted Officer Blalack as he responded to a report of a burglary, forcing Officer Blalack to take his attention away from the task at hand and creating a dangerous situation for Officer Blalack, other police officers, and A.S.B. At that time, A.S.B. told Officer Blalack that he believed the Whitefish Police Department was conspiring against him. Officer Blalack was continuously concerned that A.S.B.'s aggressive and intimidating conduct would result in either an officer or A.S.B. getting hurt.

¶10 After A.S.B.'s arrest for disorderly conduct, A.S.B. allegedly told Officer Blalack that a medical device was implanted in his body when he was young to control his life, and that he was resisting that group's effort to control him as a result. A.S.B. also allegedly stated that he

believed most law enforcement officers were involved in the conspiracy to control his life. A.S.B. denied making those statements.

¶11 The day after A.S.B.'s arrest, the Whitefish Police Department requested that Brooks Baer, a certified mental health professional, assess A.S.B.'s mental health. Mr. Baer conducted an assessment at the hospital emergency room, and though A.S.B. was extremely guarded, he admitted to Mr. Baer that he believed the Whitefish Police Department was in a conspiracy against him. A.S.B. also indicated to Mr. Baer that he believed his head was "half the size it used to be and it's shrinking all the time." Mr. Baer concluded that A.S.B. misconstrued cues from women and law enforcement officers, resulting in a strong risk for affective violence. Mr. Baer believed A.S.B. suffered from paranoid schizophrenia, and testified at A.S.B.'s adjudicatory hearing that the threat of violence from A.S.B. was imminent. Mr. Baer further testified: "In this case I see clear elements of risk. I think the likelihood that they're going to combine to a catastrophic outcome ... is 100 percent."

¶12 At the conclusion of Mr. Baer's assessment, the Flathead County Attorney's Office filed a Petition for Involuntary Commitment, in response to which the District Court entered an order appointing the necessary persons and scheduling, among other things, an adjudicatory hearing. A.S.B. was admitted to the Pathways Treatment Center in Kalispell pursuant to that order. Prior to his adjudicatory hearing, A.S.B. filed a Request for Examination by Professional Person of Respondent's Choosing. The District Court granted A.S.B.'s request, and the adjudicatory hearing was held on September 26, 2006.

¶13 Sandra Cox is the full-time staff psychiatrist at Pathways who conducted the initial evaluation of A.S.B. and acted as his treating physician thereafter, meeting with him twelve times in approximately three weeks. At the adjudicatory hearing, Dr. Cox testified that she diagnosed A.S.B. with chronic paranoid schizophrenia, and recommended that the District Court commit A.S.B. to the state hospital. Dr. Cox explained the basis for her recommendation as follows:

> [T]hroughout [A.S.B.'s] thought content, there is a pervasive paranoid ideation throughout all of his content. He–he makes loose associations between events and circumstances and people which may not be related in any way, shape or form to one another, which lead him to feel paranoid, feel as if others are plotting against him and out to get him.
>
> And he presents himself as someone who does not avoid fights,

who does not avoid conflict. In fact [he] steps up to the plate in a situation of conflict to present himself even in a violent way. He calls himself a rough guy and believes that he is being picked on by multiple systems and people.

While Dr. Cox could not conclude that A.S.B. posed an "imminent" threat of harm to others–Dr. Cox acknowledged that nobody could make such a prediction–she did state that A.S.B. posed a significant threat to himself and others because he was likely to respond aggressively in situations when he felt sufficiently threatened. Dr. Cox predicted that A.S.B.'s refusal to accept treatment for his chronic paranoid schizophrenia would cause it to worsen and deteriorate considerably. Dr. Cox testified that Pathways was not an appropriate treatment center for A.S.B. because of his refusal to take medication and accept treatment.

¶14 Edward Trontel is the licensed psychologist that conducted the independent examination of A.S.B. at his request. At A.S.B.'s adjudicatory hearing, Dr. Trontel agreed that A.S.B. suffered from paranoid schizophrenia, but said he could not affirmatively state that A.S.B. posed an "imminent" threat of harm to himself or others. The basis for Dr. Trontel's conclusion was that A.S.B.'s "suspiciousness, his sense that he was the object of both scrutiny and mistreatment was generalized rather than focused on a specific individual and specific place and time." Dr. Trontel explained: "[T]o be really clear for the Court, my hesitancy was about the issue of imminence. I think in comparison to other people with his illness, he poses a higher risk than average. So I am not arguing against a risk, only my ability to predict an imminent risk." Dr. Trontel did not hesitate, though, in agreeing with the prosecutor that A.S.B. posed a threat of danger to himself and others, and that the threat would continue into the foreseeable future. Dr. Trontel simply doubted his ability to predict the specific circumstances in which A.S.B. would find himself in the future. As he stated on redirect examination, "I've been dancing vigorously sideways because my–I am not asserting that it is not an imminent threat, I am simply stating I can't say. I don't have enough information to make that statement."

¶15 At the conclusion of the adjudicatory hearing the District Court determined that A.S.B. suffers from a mental disorder, that his mental condition will continue to decline, and that if he is left untreated, A.S.B. will become a danger to himself and others. The District Court further determined that because of A.S.B.'s mental disorder there exists an imminent threat of injury to A.S.B. and others. Accordingly,

the District Court ordered that A.S.B. be involuntarily committed to the Montana State Hospital for treatment and medication. A.S.B. appeals.

## STANDARD OF REVIEW

¶16 We have often stated that "[w]e review the sufficiency of the evidence in civil commitment proceedings in a light most favorable to the prevailing party and do not disturb a district court's findings of fact unless they are clearly erroneous." *Matter of D.S.*, 2005 MT 152, ¶ 12, 327 Mont. 391, ¶ 12, 114 P.3d 264, ¶ 12 (citing *Matter of C.R.C.*, 2004 MT 389, ¶ 11, 325 Mont. 133, ¶ 11, 104 P.3d 1065, ¶ 11). A finding is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if this Court has a definite and firm conviction after reviewing the record that a mistake has been made. *Matter of C.R.C.*, ¶ 11.

¶17 Although the first standard of review stated above is an often-used formulation in our commitment cases, that statement is actually a merging of two review standards which may promote some confusion. To clarify, our viewing the evidence "in a light most favorable to the prevailing party" is a subset of the first prong of the three prong standard by which we review a finding of fact asserted to be clearly erroneous, that is, whether the finding is supported by substantial evidence. For purposes of that inquiry, we view the evidence in a light most favorable to the prevailing party. The following correct statement of the complete standards of review recently provided may facilitate clarification of the standards for involuntary commitment cases:

> We review the findings of a district court sitting without a jury to determine if the court's findings were clearly erroneous. *See* M. R. Civ. P. 52(a). A district court's findings are clearly erroneous if substantial credible evidence does not support them, if the district court has misapprehended the effect of the evidence or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. *Ray v. Nansel*, 2002 MT 191, ¶ 19, 311 Mont. 135, ¶ 19, 53 P.3d 870, ¶ 19. *Additionally, we must view the evidence in the light most favorable to the prevailing party when determining whether substantial credible evidence supports the district court's findings. Ray*, ¶ 19. We review a district court's conclusions of law to determine whether those conclusions are correct. *In re Estate of Harms*, 2006 MT 320, ¶ 12, 335 Mont. 66, ¶ 12, 149 P.3d 557, ¶ 12. *Byrum v. Andren*, 2007 MT 107, ¶ 14, 337 Mont. 167, ¶ 14, 159 P.3d

1062, ¶ 14 (emphasis added).

## DISCUSSION

¶18 **Is the "deterioration standard" contained in § 53-21-126(1), MCA, unconstitutional?**

¶19 A.S.B. argues that § 53-21-126(1)(d), MCA, is unconstitutional because "it purports to allow involuntary commitment based on the mere possibility that an individual's condition may worsen to a point where he poses a threat of harm to himself or others." Section 53-21-126(1)(d), MCA, provides:

> In determining whether the respondent requires commitment and the appropriate disposition under 53-21-127, the court shall consider the following:
>
> (d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, *predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others* or will be unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety. Predictability may be established by the respondent's relevant medical history.

(Emphasis added). According to A.S.B., the speculative nature of the "deterioration standard" is not "a constitutionally adequate purpose for the confinement," and is therefore unconstitutional under *O'Connor v. Donaldson*, 422 U.S. 563, 574, 95 S. Ct. 2486, 2493 (1975).

¶20 The State points out, and A.S.B. does not refute, that A.S.B. did not present his challenge to the constitutionality of § 53-21-126(1)(d), MCA, to the District Court. We have repeatedly held that we will not review issues raised for the first time on appeal. *Point Serv. Corp. v. Myers*, 2005 MT 322, ¶ 31, 329 Mont. 502, ¶ 31, 125 P.3d 1107, ¶ 31 (citing *Day v. Payne*, 208 Mont. 273, 276, 929 P.2d 864, 866 (1996)). This includes new arguments and changes in legal theory. *Day*, 280 Mont. at 276, 929 P.2d at 866. This rule "is based on the principle that it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." *Day*, 280 Mont. at 276-77, 929 P.2d at 866 (citation omitted). Although we have recognized an exception to the general rule where "the alleged ... error affects the substantial rights of a litigant," *In re N.B.*, 190 Mont. 319, 323, 620 P.2d 1228, 1231 (1980), our decision to do so is discretionary, and we decline to apply the "substantial rights" exception here.

¶21 **Did the District Court err by determining that A.S.B.'s mental condition will, if left untreated, deteriorate to a point where A.S.B. will pose a threat to himself or others?**

¶22 The District Court found that the State established with a reasonable degree of medical certainty that A.S.B. suffers from a mental disorder. All three mental health experts agreed that A.S.B. suffers from paranoid schizophrenia, and A.S.B. does not dispute that finding. The District Court also found beyond a reasonable doubt that the physical facts alleged by the State had occurred, including Officer Blalack's need to pull his firearm from its holster three times, A.S.B.'s disruption of a burglary investigation, and A.S.B.'s consistent misinterpretation of circumstances as threats and aggressive response thereto. A.S.B. does not dispute those findings either. Rather, A.S.B. argues there was not substantial evidence to support the District Court's finding by clear and convincing evidence that A.S.B.'s mental condition will, if left untreated, deteriorate to a point where A.S.B. will pose a threat to himself or others. *See* § 53-21-126(1)(d), MCA.

¶23 The standard of proof in a hearing on petition for involuntary commitment is

> proof beyond a reasonable doubt with respect to any physical facts or evidence and clear and convincing evidence as to all other matters. However, the respondent's mental disorder must be proved to a reasonable medical certainty. Imminent threat of self-inflicted injury or injury to others must be proved by overt acts or omissions, sufficiently recent in time as to be material and relevant as to the respondent's present condition.

Section 53-21-126(2), MCA. According to A.S.B., the only testimony provided regarding the likelihood of deterioration was Dr. Cox's testimony that the mental condition of one who suffers from paranoid schizophrenia traditionally worsens over time without treatment. This, A.S.B. argues, represents "an undefined statistical chance" of deterioration that cannot be used to support a finding that A.S.B.'s specific mental condition would deteriorate. A.S.B. argues that allowing him to be involuntarily committed on the basis of a "mere statistical probability" violates the fundamentals of due process.

¶24 ■ However, contrary to A.S.B.'s argument, the State is not required to prove that A.S.B.'s mental condition *will* deteriorate if left untreated. Rather, § 53-21-126(1)(d), MCA, allows the court to consider whether a respondent's condition will *"predictably* result in deterioration of the respondent's mental condition" if untreated, thereby threatening the wellbeing of the respondent or others.

(Emphasis added). Mr. Baer, Dr. Trontel, and Dr. Cox all testified that A.S.B. was likely to hurt somebody if he was not treated for his paranoid schizophrenia. According to Dr. Cox, the likelihood of A.S.B. hurting somebody else was a very realistic concern, "particularly in light of the fact that he has an illness for which he is refusing treatment. And this illness over time tends to–what we know about chronic paranoid schizophrenia is that over time it tends to–to worsen and the condition tends to deteriorate without treatment." A.S.B. did not contradict that testimony, nor did he discredit Dr. Cox's testimony that A.S.B.'s mental disorder was statistically likely to continue deteriorating and would likely result in an even greater loss of his ability to distinguish real dangers from perceived threats. A.S.B. merely elicited an admission from Mr. Baer that *some* paranoid schizophrenics do not deteriorate. Viewing the evidence in a light most favorable to the prevailing party, we hold that the District Court's determination that A.S.B.'s mental condition would likely deteriorate if left untreated was not clearly erroneous.

¶25 **Did the District Court err by determining that, due to a mental disorder, A.S.B. poses a risk of imminent harm to himself or others?**

¶26 In determining whether or not a respondent requires involuntary commitment, a District Court must also consider "whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions." Section 53-21-126(1)(c), MCA. "Imminent threat of self-inflicted injury or injury to others must be proved by overt acts or omissions, sufficiently recent in time as to be material and relevant as to the respondent's present condition." Section 53-21-126(2), MCA. A.S.B. argues that substantial evidence did not support the District Court's determination that A.S.B. poses a risk of imminent harm to himself or others due to a mental disorder. Specifically, A.S.B. argues that none of the mental health professionals who testified at his hearing would definitively state that the threat of harm posed by A.S.B. was "imminent."

¶27 This Court addressed the question of what is an "imminent threat of injury" in *Matter of F.B.*, 189 Mont. 229, 615 P.2d 867 (1980). We stated:

> Imminent threat does not mean that a person may possibly cause an injury at some time in the distant or uncertain future. The danger must be fairly immediate. At the same time, the law does not require proof beyond a reasonable doubt that an injury will

occur in the future. Threat is not certainty. The law requires only proof beyond a reasonable doubt that the threat of future injury presently exists and that *the threat is imminent, that is, impending, likely to occur at any moment.* If beyond a reasonable doubt there is a present indication of probable physical injury which is *likely to occur at any moment or in the immediate future*, and if this injury would be a result of a mental disorder, then the person suffering from such mental disorder is seriously mentally ill within the meaning of the act.

*Matter of F.B.*, 189 Mont. at 233, 615 P.2d at 869 (emphasis added). In *Matter of F.B.*, the appellant caused multiple disturbances at a hotel, including being loud, abusive, and throwing food. When police officers arrived at his room, F.B. had armed himself with a baseball bat. After he was taken to the hospital, F.B. again threw food on the floor, tore the sheets off his bed, and was hostile and angry. F.B. was ultimately diagnosed as a paranoid schizophrenic given his angry and threatening behavior. *Matter of F.B.*, 189 Mont. at 234, 615 P.2d at 870. Despite F.B.'s argument that he had not yet hurt himself or others, we upheld the district court's commitment of F.B. based upon these "overt acts," which demonstrated the imminence of the threat F.B. posed. *Matter of F.B.*, 189 Mont. at 235, 615 P.2d at 870.

¶28  We also addressed the "overt acts" requirement of an "imminence" finding in *Matter of D.D.*, 277 Mont. 164, 920 P.2d 973 (1996). In that case, the professional person testified at D.D.'s commitment hearing that D.D. was a potential danger to himself and others because he was consistently paranoid and afraid that someone was about to attack him. *Matter of D.D.*, 277 Mont. at 168-69, 920 P.2d at 975. The professional person stated that D.D. could "very easily" attack someone out of fear and anticipation that the person was about to attack him. D.D. also refused to take medication to control his paranoia. We held that D.D.'s statements to the professional person constituted "overt acts" in and of themselves, and concluded that, viewing the evidence in a light most favorable to the prevailing party, the record contained "clear and convincing evidence that D.D. was suffering from a mental disorder demonstrated by an overt act resulting in an imminent threat of injury to himself or others." *Matter of D.D.*, 277 Mont. at 168-69, 920 P.2d at 975.

¶29 We agree with the State that A.S.B.'s overt acts are more pronounced than D.D.'s, and that the mere fact that A.S.B. has not hurt anybody in the past is not determinative of whether he poses an imminent threat of harm to himself or others in the future. A.S.B.

stated that he believed local police officers were in a conspiracy against him, and repeatedly placed himself in situations requiring the police to investigate him. A.S.B. told Mr. Baer, "the more I get messed with, the more I want to do something about it." When police investigated complaints about A.S.B., A.S.B. was aggressive and intimidating, and on at least three occasions refused to comply with the police's basic requests, forcing Officer Blalack to remove his weapon from its holster. A.S.B. also disrupted one of Officer Blalack's burglary investigations, creating a potentially dangerous situation for himself, Officer Blalack, and other police officers.

¶30 A.S.B. tries to discredit the testimony of the State's mental health witnesses by arguing that none of them could say with confidence that A.S.B. posed an imminent threat of harm. However, Mr. Baer did testify that he believed "without question there's an imminent threat of violence .... I think there is a serious imminent threat where he could respond violently ...." Mr. Baer further testified that the likelihood of circumstances in A.S.B.'s life combining into a catastrophic outcome was "100 percent."

¶31 While neither of the other two mental health experts felt comfortable stating that the threat of harm from A.S.B. was "imminent," both of them agreed that it was almost certain to happen. A.S.B.'s independent expert, Dr. Trontel, testified that A.S.B. presented "a threat of danger to himself or others." Indeed, Dr. Trontel testified that if A.S.B. was allowed back out into public, the threat of him being hurt or hurting somebody else was present, and would be in the foreseeable future. Just as he could not say with certainty that the threat of A.S.B. harming someone was imminent, Dr. Trontel also stressed that he could not say the threat was *not* imminent either. He simply could not predict one way or the other. Likewise, Dr. Cox—who met with A.S.B. twelve times prior to the adjudicatory hearing—testified that A.S.B. "does pose a threat to others," and that such threat is in fact greater than others with a similar mental disorder because A.S.B. "is not a timid guy." With respect to imminence, Dr. Cox stated: "[I]s he saying to me I'm going to hurt someone now or in the very near future—no he's not. But I do believe he is at high risk for engaging in violent behavior if he feels sufficiently threatened."

¶32 ■ The only variable preventing Dr. Trontel and Dr. Cox from stating that the threat of harm was imminent was their inability to predict when precisely circumstances in A.S.B.'s daily life would culminate into a threat that he felt he needed to act upon. Such an

event could happen at any time, depending on the circumstances. In determining imminence of a threat of harm, *Matter of F.B.* asks whether "the threat of future injury presently exists and [whether] that the threat is imminent, that is, impending, likely to occur at any moment." *Matter of F.B.*, 189 Mont. at 233, 615 P.2d at 869. As we stated, "[t]he danger must be fairly immediate. At the same time, the law does not require proof beyond a reasonable doubt that an injury will occur in the future. Threat is not certainty." In the present case, we conclude that the District Court's finding that there was an imminent threat of injury to A.S.B., when viewed in a light most favorable to the State as the prevailing party, is supported by substantial credible evidence and is not otherwise clearly erroneous.

¶33 **Did the District Court err by attaching and incorporating into its order a written report which was not admitted at the adjudicatory hearing, and if so, was it harmless error?**

¶34 In the District Court's order involuntarily committing A.S.B. to the Montana State Hospital, the court noted that its finding that A.S.B. was suffering from a mental disorder requiring commitment was supported by the written report of Mr. Baer attached to the State's petition. The District Court made no reference to Mr. Baer's report in its oral findings at the close of A.S.B.'s hearing, but expressly incorporated that written report into its order. A.S.B. argues that the District Court erred by incorporating that report because the report contained hearsay, the introduction of which was precluded by the District Court during the hearing.

¶35 Laws regarding involuntary commitment must be strictly followed. *Mental Health of T.J.D.*, 2002 MT 24, ¶ 20, 308 Mont. 222, ¶ 20, 41 P.3d 323, ¶ 20. Section 53-21-126(3), MCA, provides that in a trial or hearing on a petition for involuntary commitment, the written opinion and diagnosis of the professional person "may be attached to the petition, but any matter otherwise inadmissible, such as hearsay matter, is not admissible merely because it is contained in the report." We held in *Mental Health of T.J.D.* that the District Court erroneously relied on inadmissible hearsay statements contained in the professional person's report. We reversed T.J.D.'s commitment because the report's hearsay information was the only evidence of imminent threat of injury in the record, and thus, it was not harmless error for the district court to admit and rely on that report. *Mental Health of T.J.D.*, ¶¶ 16-18. Similarly, we held in *Mental Health of D.L.T.*, 2003 MT 46, 314 Mont. 297, 67 P.3d 189, that the district court abused its discretion by admitting hearsay testimony through the professional

person, who was the only witness at the hearing. We observed that "the only evidence of D.L.T.'s 'act[s] or omission[s]' leading to injury or imminent threat of injury to herself or others ... is the statements of persons not present at the hearing ...." *Mental Health of D.L.T.*, ¶ 17. There, the professional person was merely testifying as to matters reported by D.L.T.'s husband, parents, counselor, and a city court judge, all of which was hearsay. *Mental Health of D.L.T.*, ¶ 11. Because the only evidence presented was hearsay, we held that the testimony of the professional person was insufficient to support D.L.T.'s involuntary commitment, and we reversed. *Mental Health of D.L.T.*, ¶ 18.

¶36 Here, although we agree with A.S.B. that the District Court erred by attaching and incorporating the hearsay in Mr. Baer's report into its order, we nonetheless hold that such error was harmless. *See Matter of S.C. and L.Z.*, 2005 MT 241, ¶ 29, 328 Mont. 476, ¶ 29, 121 P.3d 552, ¶ 29 ("[a] harmless error does not mandate that we reverse a district court judgment; an error must cause substantial prejudice to warrant reversal.") (citation omitted). The District Court sustained an objection to the State's attempted presentation of the same hearsay evidence at the commitment hearing, and its determination was adequately supported by the hearing testimony of Mr. Baer, Dr. Cox, and Dr. Trontel. Indeed, Mr. Baer testified that, based on his interview with A.S.B. at the hospital, he believed there was an imminent threat of violence that was 100 percent likely to result in a catastrophic outcome. Dr. Trontel testified that A.S.B. presented "a threat of danger to himself or others" which would continue to be present in the foreseeable future. Dr. Cox also confirmed that A.S.B. was at a high risk for engaging in violent behavior. Officer Blalack's testimony provided additional, firsthand evidence of A.S.B.'s dangerous behavior in public. We hold that, in light of the non-hearsay testimony received regarding A.S.B.'s mental disorder, the incorporation of Mr. Baer's report into the District Court's order was harmless error.

¶37 Affirmed.

JUSTICES COTTER, WARNER and MORRIS concur.

CHIEF JUSTICE GRAY, dissenting.

¶38 I respectfully, but strenuously, dissent from the Court's opinion on Issues 1 and 3. Because I would conclude that the statutory "deterioration" standard is unconstitutional, I would not address Issue 2. I would resolve Issue 3 by concluding the District Court's finding that, due to a mental disorder, A.S.B. poses an imminent threat of injury to himself or others is insufficient as a matter of law. I would

not address Issue 4.

¶39 It is undisputed that a Montanan may be involuntarily committed only when s/he has a mental disorder and requires commitment. It also is undisputed that A.S.B. was diagnosed during these proceedings with–and has–the mental disorder of paranoid schizophrenia.

¶40 In determining whether commitment is required, a trial court may consider a number of statutory factors. In this case, the statutory factors alleged by the State were that *"because* of a mental disorder, there is an imminent threat of injury to the respondent or to others *because* of the respondent's acts or omissions" and "the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others[.]" Sections 53-21-126(1)(c) and (d), MCA (emphasis added).

¶41 With regard to Issue 1, A.S.B. argues the "deterioration" standard for commitment contained in § 53-21-126(1)(d), MCA, is unconstitutional. In ¶ 20, the Court responds with the general rule that, because the issue is raised for the first time on appeal, we will not consider it. The Court also properly observes that we have a seldom-used exception to that general rule where "the alleged ... error affects the substantial rights of a litigant."

¶42 I am generally a passionate proponent of not addressing issues raised for the first time on appeal, because of the "unfairness" to the trial court and for other reasons as well. However, it is not the trial court's liberty and due process rights which are at issue here. A.S.B.'s fundamental constitutional rights *are* at issue. Because no serious question can exist about whether these are "substantial rights," I would follow the lead of the 1980 *N.B.* Court–a case also involving a newly-raised constitutional issue in an involuntary commitment proceeding–and exercise discretion to address this issue. I am disappointed that–in the 21st century–we would refuse to do so when the result may impact on the liberty of scores, perhaps hundreds, of mentally ill Montanans every year.

¶43 I turn, then, to whether the deterioration standard for involuntary commitment contained in § 53-21-126(1)(d), MCA, violates the United States Constitution. I would hold that it does. I offer only an abbreviated legal analysis which, in my view, mandates a holding that it is unconstitutional to involuntarily commit a mentally ill person on the basis of a mental disorder which will, "if untreated, predictably result in deterioration" of the mental condition to the point that the

person becomes a danger to self or others or unable to provide for basic needs.

¶44 Involuntary commitments involve a "massive curtailment of liberty." *See Humphrey v. Cady*, 405 U.S. 504, 509, 92 S. Ct. 1048, 1052 (1972). The involuntary commitment of a mentally ill person is not constitutionally permissible unless the person is dangerous to someone or cannot live safely in freedom. *O'Connor v. Donaldson*, 422 U.S. 563, 575, 95 S. Ct. 2486, 2493 (1975). Even more to the point, the United States Court of Appeals for the Ninth Circuit has determined–in holding portions of a Hawai'i involuntary commitment statute unconstitutional–that "the danger must be imminent to justify involuntary commitment ... [and] it is unconstitutional to commit one who does not pose an imminent danger[.]" *Suzuki v. Yuen*, 617 F.2d 173, 178 (9th Cir. 1980).

¶45 Acknowledging that the federal authorities cited above involve somewhat different factual and procedural backgrounds, I nevertheless urge that the fundamental principles stated therein are wholly applicable to Montana's "deterioration" standard. The Hawai'i statute was unconstitutional because it required "danger" but not imminent danger. *See Suzuki*, 617 F.2d at 178. On that basis, Montana's entirely future-oriented and merely "predictable at some unknown later time" danger, set forth as the deterioration standard in § 53-21-126(1)(d), MCA, simply cannot withstand constitutional scrutiny.

¶46 Some would contend that it is kind and appropriate for the State to be so concerned about its mentally ill persons as to want to force treatment and commitment on them in advance of an imminent threat of injury resulting from a mental disorder. I would not. In my view, the time is long past for such paternalistic notions about mental illnesses and the people who have them. People–mentally ill or otherwise–generally have a right to be left alone unless they are an imminent danger to those around them or are committing a criminal offense. In any event, this issue is purely constitutional and I would hold that § 53-21-126(1)(d), MCA, violates the United States Constitution and cannot be used in Montana to involuntarily commit a person with a mental disorder.

¶47 Turning to Issue 3, I would vacate the commitment order. I dissent from the Court's failure to do so.

¶48 We have repeatedly stated that "Montana's civil commitment laws are to be strictly followed." *Matter of R.M.*, 270 Mont. 40, 44, 889 P.2d 1201, 1204 (1995) (citation omitted). Indeed, we have held that "the statutes governing involuntary commitment are critically important

because of the 'calamitous effect of commitment,'" including loss of liberty and damage to a person's reputation. *See In re G.M.*, 2007 MT 100, ¶ 19, 337 Mont. 116, ¶ 19, 157 P.3d 687, ¶ 19 (citation omitted). For these reasons, I would address the legal issue of whether the District Court's findings meet statutory requirements. In other words, I would exercise *de novo* review to determine whether the trial court correctly interpreted and applied controlling statutes. *See In re Mental Health of E.P.B.*, 2007 MT 224, ¶ 5, 339 Mont. 107, ¶ 5, 168 P.3d 662, ¶ 5.

¶49 Section 53-21-127(8), MCA, requires a detailed statement of the facts upon which the trial court finds the respondent to be suffering from a mental disorder and requiring commitment. In the present case, the District Court made the following findings relative to the § 53-21-126(1)(c), MCA, factor:

> The Court finds that beyond a reasonable doubt that as a result of the Respondent's mental condition Officer Blalack had to pull his firearm out of his holster on three separate occasions when encountering the Respondent; that the Respondent followed Officer Blalack to a burglary call; that the Respondent consistently misinterprets facts and circumstances to be threats against him, and that the Respondent responds to these perceived threats in an aggressive, rough fashion.

> The Court also finds that because of the Respondent's mental illness and the facts presented there exists an imminent threat of injury to the Respondent or others.

¶50 Focusing on the District Court's findings, the single overt act by A.S.B. contained therein is following Officer Blalack to a burglary call. As to this single overt act by A.S.B., the State did prove it beyond a reasonable doubt, as required by § 53-21-126(2), MCA. However, nothing in the District Court's findings establishes any imminent threat of injury to anyone *because of* that act.

¶51 A person cannot be involuntarily committed unless overt acts or omissions result from a mental disorder and result in an imminent threat of injury to self or others. The District Court's findings do not set forth overt acts or omissions by A.S.B. which result in an imminent threat of injury to anyone. They are insufficient as a matter of law. *See In re Mental Health of E.P.B.*, ¶¶ 14-15; *In re G.M.*, ¶¶ 21-23. I would reverse the District Court on that basis.

¶52 In addition to the analysis set forth above, I cannot join the Court's analysis of whether substantial evidence supports the District Court's findings. First, the Court examines the record for evidentiary

support for "imminent threat of injury" in a vacuum. As discussed above, it is my opinion that only the combination of an overt act caused by the mental disorder sufficiently recent in time as to be relevant, and a resulting imminent threat of injury can form the basis for a § 53-21-126(1)(c), MCA, involuntary commitment. Thus, even assuming *arguendo* that the Court's assessment of the evidence on that single part of the needed combination were correct, it would not be enough to support committing A.S.B.

¶53 Second, I simply disagree that the District Court's imminent threat of injury finding is supported by substantial credible evidence, even when viewed in the State's favor. "Imminent" means just that. Not at a totally undefined time, as Mr. Baer testified; not a threat almost certain to happen, as Drs. Trontel and Cox suggested; not merely because A.S.B. is "not a timid guy" or "is at high risk for engaging in violent behavior *if* he feels sufficiently threatened." Opinion, ¶ 31.

¶54 To me, the record before us supports findings that A.S.B. is a homeless person who, as it turned out during these proceedings, has a mental disorder. A.S.B. lived in his truck and sometimes parked it in residential areas or parking lots for a period of time. Neighborhood residents were sometimes wary and concerned over his presence. Indeed, they called the Whitefish Police Department with some frequency to make a "suspicious activity-suspicious person" report. On each occasion, law enforcement contacted A.S.B., who–understandably, in my view–does not appreciate the level of watchfulness to which he is subjected when he is doing nothing wrong at all. Law enforcement would then commonly report to the resident, "Yeah, we know who he is, he's between homes, he should be okay." Law enforcement wants A.S.B. to know they are watching him and, yes, law enforcement has had other contacts with A.S.B. which they found problematic. On the occasion which ultimately resulted in these proceedings, Officer Blalack yet again approached and inquired of A.S.B. for little or no reason.

¶55 I fear that 21st century Montana remains willing to involuntarily commit far too many people with mental disorders. It is done often and cannot readily be rectified because the time for getting a case through an appeal is always far longer than the period of the commitment. It is certainly convenient for the State to remove people with mental illnesses from our midst for 90 days, forcibly medicate them and then–having allayed unreasonable fears at significant cost to the taxpayers and extraordinary strain on the resources of the Montana

State Hospital—return them to communities to start the cycle all over again. Such convenience does not satisfy statutory and constitutional requirements, however.

¶56 I strongly dissent from the Court's opinion. I would hold § 53-21-126(1)(d), MCA, unconstitutional. I also would reverse the District Court's findings of fact regarding imminent threat of injury as both legally insufficient and clearly erroneous. Finally, and most importantly, I would vacate the commitment order.