No. 05-343

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 166

IN THE MATTER OF A.K.,

        Respondent and Appellant.

APPEAL FROM:    District Court of the Third Judicial District,
                    In and For the County of Powell, Cause No. DI 2005-003
                    Honorable Ted L. Mizner, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Ben Krakowka, Assistant Public Defender, Anaconda, Montana

        For Respondent:

                Hon. Mike McGrath, Attorney General; Tammy K. Plubell,
                Assistant Attorney General, Helena, Montana

                Christopher G. Miller, Powell County Attorney, Deer Lodge, Montana

        For Amicus Curiae:

                Beth Brenneman, Montana Advocacy Program, Helena, Montana

                          Submitted on Briefs:  January 4, 2006

                                    Decided:  July 20, 2006

Filed:

                                 Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1     A.K. appeals from the order of the Third Judicial District Court, Powell County, committing her to the Montana State Hospital (MSH) for treatment of serious mental illness. We reverse and remand.

¶2     We restate the issue on appeal as whether the District Court erred in finding that A.K.'s mental disorder rendered her a danger to herself and others.

BACKGROUND

¶3     On April 22, 2005, the Powell County Attorney filed a petition for the involuntary commitment of A.K., a 25-year-old woman. The petition alleged A.K. had a mental disorder and required commitment. The petition was based on an attached letter and consultation summary dated April 21, 2005, from mental health professional Delbert D. Fisher. The petition also sought detention of A.K. at MSH pending the requested hearing because A.K. "is a danger to herself or others."

¶4     In his one-paragraph letter supporting the petition, Fisher reported that he had received a telephone call from Dr. Robert Caldwell, who relayed information received from A.K.'s medical professional that A.K. had been diagnosed with bipolar disorder, developmental disorder and polysubstance dependence. The letter stated A.K. had discontinued taking her prescription medications for three months, had been drinking alcohol and traveling with people she did not know, and had run up a phone bill of $7,000 and a cell phone bill of $900. The letter further stated that, in the past, A.K. had met a couple via the internet, "traveled to NYC" and was held hostage, beaten and had her money stolen. More

2

recently, she "found a way to empty her bank account, despite having a payee." Fisher ended his letter by recommending that A.K. be committed to MSH. The only diagnosis contained in Fisher's consultation summary was "bipolar" and it was designated as a "known past diagnosis." Fisher represented that A.K.'s impulse control and judgment were "severely impaired."

¶5 On April 22, 2005, the District Court appointed counsel to represent A.K., held a telephonic hearing with A.K. and counsel, and appointed a professional person to evaluate A.K. The court scheduled a commitment hearing for Monday, April 25, 2005, and ordered A.K. detained at MSH until the hearing.

¶6 The sole witness at the commitment hearing was G. Michael Sawicki, II, a licensed clinical social worker and certified mental health professional. A.K.'s counsel objected on hearsay grounds to the admission of any testimony by Sawicki about a page attached to the end of Fisher's consultation summary and to admission of that page, and the District Court sustained the objection. Sawicki testified he had reviewed Fisher's case notes and information, and also consulted with Caldwell before conducting "a mini mental status exam, a diagnostic interview, a very brief risk assessment, and a fairly brief psychosocial history" of A.K. that morning. He concluded that A.K.'s reported symptoms and his observations were consistent with a diagnosis of bipolar disorder with a recent manic episode. Sawicki also diagnosed A.K. as mildly mentally retarded with a suggestion of borderline personality disorder. When asked if these diagnoses caused A.K. to be a danger to herself or others, Sawicki responded that A.K.'s judgment and impulse control were profoundly impaired and that her cognitive delay put her at significant risk, due to being easily influenced and

3

suggestible; in Sawicki's opinion, A.K.'s ability to defend or protect herself was "more at a childlike level."

¶7 The County Attorney next asked Sawicki whether A.K.'s conduct on one night the previous week of drinking rather heavily and being in the company of people she did not know was an example of her lack of ability to protect herself. Sawicki answered:

> [A]ny of us could go and drink too much and end up at the wrong place at the wrong time. In this case, however, I feel it is profound in that that event happened and that she lacked the insight, or concern or worry, when recollecting it, she lacked the capacity to grasp how dangerous that situation and that behavior ultimately can be.

Thereafter, the District Court sustained hearsay objections by A.K.'s counsel to testimony about A.K.'s conduct in the past and any other information in Fisher's report. In further response to inquiries by A.K.'s counsel and the County Attorney, Sawicki testified he could not identify or point to a single recent overt act that would have initiated the interview by Fisher or police involvement with A.K.

¶8 The District Court subsequently entered brief and conclusory findings of fact regarding A.K.'s condition. It also found that no treatment facilities less restrictive than MSH were available for A.K.'s care and treatment. The District Court ultimately ordered A.K. committed to MSH for a period not to exceed 90 days. A.K. appeals.

## STANDARD OF REVIEW

¶9 We review a trial court's findings of fact in an involuntary commitment case to determine whether, upon viewing the evidence in a light most favorable to the prevailing party, the findings are clearly erroneous. *In re Mental Health of C.R.C.*, 2004 MT 389, ¶ 11, 325 Mont. 133, ¶ 11, 104 P.3d 1065, ¶ 11 (citation omitted).

4

¶10 Did the District Court err in finding that A.K.'s mental disorder renders her a danger to herself and others?

¶11 The statutes governing involuntary commitment are critically important due to the "calamitous effect of a commitment," which includes loss of liberty and damage to the respondent's reputation; thus, the statutes are to be strictly followed. *In re Mental Health of D.L.T.*, 2003 MT 46, ¶ 8, 314 Mont. 297, ¶ 8, 67 P.3d 189, ¶ 8 (citation omitted). Indeed, in prior involuntary commitment cases, we have strongly cautioned trial courts to strictly comply with all relevant statutes. *See*, *e.g.*, *C.R.C.*, ¶ 16 (citation omitted).

¶12 In an involuntary commitment case, the trial court first determines whether the respondent suffers from a mental disorder; if so, the court determines whether the respondent requires commitment by considering various statutory criteria. Section 53-21-126(1), MCA. Commitment is justified if any of the criteria in § 53-21-126(1), MCA, are satisfied, based on the court's "detailed statement of the facts upon which the court found the respondent to be suffering from a mental disorder and requiring commitment." *See* § 53-21-127(7) and (8)(a), MCA.

¶13 One criterion justifying commitment is "whether, *because* of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions." *See* § 53-21-126(1)(c), MCA (emphasis added). Imminent threat of injury "must be proved by overt acts or omissions, sufficiently recent in time as to be material and relevant as to the respondent's present condition." Section 53-21-126(2), MCA; *C.R.C.*, ¶ 22 (citations omitted). Another criterion the trial court may consider regarding commitment is

whether, because of a mental disorder, the respondent is "substantially unable to provide for [her] own basic needs of food, clothing, shelter, health, or safety." Section 53-21-126(1)(a), MCA.

¶14 The District Court's findings of fact regarding whether A.K. suffered from a mental disorder requiring commitment are not lengthy. Therefore, to facilitate our discussion, we set them forth in their entirety:

> 1. That [A.K.] suffers from a bi-polar disorder, a mental illness, together with mild mental retardation, borderline personality disorder, and polysubstance abuse.
>
> 2. That [A.K.'s] mental illness is serious in that it renders her to be [a] danger to herself or others.
>
> 3. That the respondent's dangerousness is established by evidence of recent overt acts, specifically poor judgment and impaired impulse control which results in her being unable to protect herself or to meet her basic needs, as were testified to by Mr. Sawicki.
>
> 4. The Court finds that the respondent lacks insight into her condition and her judgment is significantly impaired. She is not competent to make decisions related to her medical care and treatment.

A.K. does not directly argue that these findings are statutorily deficient; she does observe generally, however, that the District Court's order of commitment did not rigorously follow statutory requirements. We have cautioned trial courts on a number of occasions that they must satisfy the requirement in § 53-21-127(8)(a), MCA, of a "detailed statement of the facts upon which the court [finds] the respondent to be suffering from a mental disorder and requiring commitment." *See*, *e.g.*, *C.R.C.*, ¶ 16; *Matter of D.D.* (1996), 277 Mont. 164, 169, 920 P.2d 973, 976; *Matter of R.J.W.* (1987), 226 Mont. 419, 424, 736 P.2d 110, 113. The District Court's findings in the present case do not satisfy the statutory mandate. Moreover,

6

such conclusory findings make our review more difficult than is necessary.

¶15    With regard to finding 1, it is undisputed that A.K. suffers from a mental disorder --namely, bipolar disorder.  The first portion of the District Court's finding, referencing bipolar disorder, is sufficient to establish a mental disorder.  A.K. asserts, however, that the inclusion of her mild mental retardation and polysubstance abuse in the finding is improper, and we agree.  The term "mental disorder" does not include "mental retardation;" nor does it include "addiction to drugs or alcohol."  *See* § 53-21-102(9)(a), MCA.  The District Court's inclusion of mental retardation and polysubstance abuse does not relate to the issue of whether a mental disorder exists.  Moreover, while the court may have intended merely to mention these other matters as additional "factual matters," that inclusion--when overlaid onto the court's subsequent findings--confuses the present case considerably.  This is especially so because Sawicki did not provide any testimony about whether or how bipolar disorder or borderline personality disorder, which he stated was "suggest[ed]," may have contributed to A.K.'s situation at the time.

¶16    With regard to finding 2, that A.K.'s mental illness is "serious in that it renders her [a] danger to herself or others," we can only surmise that this was intended to track the consideration in § 53-21-126(1)(c), MCA, regarding whether, because of a mental disorder, "there is an imminent threat of injury to the respondent or to others . . .."  Again, while A.K. does not argue that this finding is insufficient on its face to constitute an "imminent threat" resulting from her mental disorder, the trial court's "danger" language reflects yet again its disregard of our holdings that involuntary commitment proceedings must strictly follow statutory requirements.  *See*, *e.g.*, *D.L.T.*, ¶ 8.  For purposes of this case only, we will follow

7

A.K.'s lead and deem the "danger" finding a finding of "imminent threat."

¶17 The "imminent threat" finding carries over to finding 3, in which the District Court determined that A.K.'s "dangerousness [was] established by evidence of recent overt acts, specifically poor judgment and impaired impulse control . . .." A.K. argues that the finding of "overt acts" is clearly erroneous because it is not supported by the evidence and, in addition, does not meet the standard for an overt act set forth in our jurisprudence. We agree.

¶18 Imminent threat of injury to self or others must be proved by "overt acts or omissions, sufficiently recent in time as to be material and relevant as to the respondent's present condition." Section 53-21-126(2), MCA; *C.R.C.*, ¶ 22. The State of Montana (State) relies on *Matter of F.B.* (1980), 189 Mont. 229, 615 P.2d 867, regarding the difficulty courts have in determining the definition of an overt act. In *F.B.*, we stated an overt act "need not be a completed act. An attempt or threat, or even a failure to act may suffice." *F.B.*, 189 Mont. at 233, 615 P.2d at 869.

¶19 The *F.B.* language is of no assistance to the State in the present case, in which there was no evidence or finding of any attempt, threat or failure to act. There was no evidence concerning specific acts or omissions evidencing A.K.'s bipolar disorder. As A.K. asserts, and the record establishes, Sawicki responded to an inquiry from A.K.'s counsel about whether he could point to a single overt act that would have initiated Fisher's interview by stating, "I cannot." In response to a question on redirect by the County Attorney, Sawicki testified "honestly, I cannot see any single overt act or omission." In addition, the County Attorney conceded that "there is no overt act as such[.]"

¶20 Notwithstanding Sawicki's testimony, the District Court entered a finding of "recent

8

overt acts." This finding is not only not supported by substantial credible evidence, it is not supported by any evidence and, in fact, is directly contrary to the evidence before the court.

¶21 Sawicki did testify, however, that he was "very aware of . . . a series of events and behaviors that when added up, in my opinion, . . . sum up to a very risky situation." The County Attorney then argued to the District Court that the "conduct that has been testified to . . . leads inescapably to a conclusion that this Respondent is unable to protect herself." The District Court apparently agreed, and found that the "recent overt acts" resulting in A.K.'s being unable to protect herself, were her "poor judgment and impaired impulse control . . . as were testified to by Mr. Sawicki."

¶22 Relying on *C.R.C.*, ¶ 33, A.K. argues on appeal that poor judgment does not constitute an overt act. The State attempts to distinguish *C.R.C.*, and also advances other cases which it asserts are more analogous to the present case. We address these cases in turn.

¶23 Like the present case, *C.R.C.* involved the existence of an undisputed mental disorder. It also involved a series of potentially risky behaviors and questionable judgment. *See C.R.C.*, ¶¶ 14, 25, 32. We stated that "[i]t may well be that C.R.C. had 'poor judgment' in a number of regards; poor judgment is a not uncommon human condition." We went on to observe that nothing of record in that case established any imminent threat of injury to C.R.C. or others. *C.R.C.*, ¶ 33. Ultimately, we concluded that "none of the evidence on which the District Court relied supports its finding that, due to her mental disorder, C.R.C. presented an imminent threat of injury." *C.R.C.*, ¶ 34.

¶24 The State attempts to distinguish *C.R.C.* from the present case on grounds that, in that case, nothing in the record indicated that the less-than-desirable conditions in which the

9

respondent was living endangered her in any way. In this regard, the State points to Sawicki's testimony that A.K.'s cognitive delays put her at significant risk because she is unable to defend or protect herself.

¶25 Both Sawicki's testimony and the District Court's finding that A.K. was unable to protect her health referenced A.K.'s limited cognitive abilities. As discussed above, however, mental retardation is not a mental disorder for purposes of treatment of the seriously mentally ill. Moreover, Sawicki did not testify that A.K.'s cognitive delays, poor judgment or impaired impulse control resulted from her bipolar disorder or borderline personality disorder rather than from her mild mental retardation. As a result, we hold that A.K.'s cognitive delays may not be used for purposes of determining that, because of her mental disorder, she presents an imminent threat requiring commitment.

¶26 The same is true for the District Court's reference to, and any reliance the court placed upon, A.K.'s polysubstance abuse. Neither addiction to drugs or alcohol nor drug or alcohol intoxication constitutes a mental disorder for purposes of treatment of the seriously mentally ill. *See* § 53-21-102(9)(b)(i) and (ii), MCA.

¶27 The State also analogizes this case to *Matter of L.C.B.* (1992), 253 Mont. 1, 830 P.2d 1299, and *Matter of G.P.* (1990), 246 Mont. 195, 806 P.2d 3. Both of those cases were decided under statutory criteria not at issue here.

¶28 In *L.C.B.*, the respondent had been arrested in connection with an automobile accident. While in custody, he appeared disoriented and confused, prompting law enforcement officials to ask that he be examined by a mental health professional. After examining the respondent, a psychiatrist diagnosed him as suffering from chronic paranoid schizophrenia

which significantly impaired his ability to meet his own basic needs and protect his life and health--grounds for commitment which are now codified at § 53-21-126(1)(a), MCA. The issue on appeal was whether the trial court's finding that the respondent had a serious mental illness which deprived him of the ability to protect his life or health was clearly erroneous. *See L.C.B.*, 253 Mont. at 2-5, 830 P.2d at 1300-01. We concluded sufficient evidence supported the trial court's finding and the finding was not otherwise clearly erroneous. *L.C.B.*, 253 Mont. at 6, 830 P.2d at 1303.

¶29   In *G.P.*, the respondent's parents requested that he be committed because he slept most of the time, ate very little, tore at his clothing, stood outside and stared into space, doubled up as if in pain, tore up his own apartment on one occasion, had not picked up his social security check---his sole source of income--and refused to take medications prescribed for him during prior hospitalizations. *G.P.*, 246 Mont. at 196, 806 P.2d at 4. The professional person appointed to examine the respondent diagnosed him as a severe chronic schizophrenic who, without medication, developed severe auditory hallucinations that directed him to do things he could not control, thus posing a danger to himself and others. As in *L.C.B.*, the issue on appeal was whether the trial court erred in finding that the respondent's serious mental illness deprived him of the ability to protect his life or health. *See G.P.*, 246 Mont. at 198, 806 P.2d at 5. That commitment criterion is now codified at § 53-21-126(1)(a), MCA.

¶30   Because the respondents in *L.C.B.* and *G.P.* were not committed under the "imminent threat of injury" criterion under any predecessor of § 53-21-126(1)(c), MCA, neither of those cases involved the same "overt acts" requirement as does the present case. Nor did the trial

11

courts in either of those cases reference the respondents' mental retardation or addiction to drugs or alcohol in connection with a commitment order. Most importantly, in each case, the appointed professional person connected the serious mental illness at issue to the respondent's significantly impaired ability or inability to protect life or health. *See L.C.B.*, 253 Mont. at 6, 830 P.2d at 1302-03; *G.P.*, 246 Mont. at 198-99, 806 P.2d at 5. In the present case, Sawicki's testimony did not connect A.K.'s serious mental illness with the claimed imminent threat of injury to A.K. or to others because of A.K.'s acts or omissions. We conclude the State's reliance on *L.C.B.* and *G.P.* is misplaced.

¶31 Finally, we observe that the District Court did use, in finding 3, the "unable to protect herself or to meet her basic needs" language paraphrasing the criterion contained in § 53-21-126(1)(a), MCA. As set forth above, this was not the basis on which the petition was filed. In any event, Sawicki did not testify that A.K.'s "poor judgment and impaired impulse control" were a result of her serious mental illness. Consequently, finding 3 is not a valid basis for A.K.'s involuntary commitment.

¶32 We hold the District Court's findings are not supported by sufficient evidence and, as a result, its order committing A.K. to the Montana State Hospital does not meet the requirements for involuntary commitment. We reverse the order of commitment and remand with directions to the District Court to vacate that order.

/S/ KARLA M. GRAY

We concur:

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS


Justice Jim Rice dissents.

¶33    The Court reverses the order committing A.K. to Montana State Hospital on the grounds that the District Court's findings of fact are unsupported by substantial evidence—specifically, the findings with regard to an "overt" act, which the Court states are "not supported by any evidence and, in fact, is directly contrary to the evidence," and, further, that the testimony "did not connect A.K.'s serious mental illness" to the claimed imminent threat of injury to A.K. arising from her actions. I disagree with these conclusions.

¶34    The "overt act" testimony on which the Court relies began on cross-examination, when A.K.'s counsel asked Sawicki if he could point to an overt act:

        A. [by Sawicki]  Can you elaborate on what you mean by an overt act?

        Q.  Overt act. --  A recent overt act, something that happened in the not too distant past, which is the reason that the police became aware that [A.K.] was in Deer Lodge, and felt that she was suffering from some sort of a psychological problem.

        A.  I cannot.

¶35    Obvious from his question, Sawicki was uncertain about counsel's meaning of the term, "overt act." In response, defense counsel defined the term as, essentially, "something recently that happened to bring A.K. to the attention of police and raised a concern she was suffering from a psychological problem." To this explanation, Sawicki answered negatively. Unfortunately, an "overt act" has nothing to do with timing or coming to the attention of

13

police, and Sawicki may have been confused about what information defense counsel was seeking. Indeed, in his direct testimony, Sawicki had testified that he did not know how A.K. had come to the attention of authorities. Regardless, when the whole of his testimony is examined, it is clear that he believed that A.K. had committed acts, recent in time, which established that she was an imminent threat to herself because of her mental disorders, as required by statute.

¶36 "Overt" is not statutorily defined, but there is no mystery to the term. It simply means "open and observable; not concealed or secret," Black's Law Dictionary, Seventh Edition; or, "open to view," Merriam-Webster's Collegiate Dictionary, Tenth Edition. Thus, "overt," as applied to acts, describes actions which can be observed.

¶37 Sawicki first testified about the observable circumstances. Without objection, Sawicki testified that A.K. was under the care of a psychiatrist for mental disorders, left Helena, without telling her mother and guardian, in the company of a person she described as a friend but whom she could not identify. This "friend" left A.K. stranded in Deer Lodge, and A.K., without communicating with home, went to a local tavern, where she proceeded to drink from noon on Wednesday to 2:00 a.m. on Thursday morning, ending up in the company of people she did not know. These actions were observable, and the Court thus errs by concluding that there was "no evidence" of overt acts.

¶38 The question for the District Court then became, under § 53-21-126(1)(c), MCA, whether these overt acts demonstrated an imminent threat of injury to A.K. because of her mental disorder. Here, the Court concludes that "no connection" was made between these acts and A.K.'s mental disorders. However, after testifying that A.K. suffered from bipolar

14

disorder and borderline personality disorder (he later identified a third problem, a "definite disability with her memory"), Sawicki testified as follows:

> Q. Do these diagnoses, or these conditions that you have diagnosed, excuse me, cause [A.K.] to be a danger to herself or others?
>
> A. In my opinion, her judgment and impulse control is profoundly impaired. It is my opinion that her cognitive delays put her at significant risk in that she is easily influenced, very suggestible, and, if you will, has – lacks – the mature adult self-care mechanisms, more accurately, her ability to defend or protect herself are more at a childlike level.
>
> Q. *Would her conduct on last Friday night* of drinking rather heavily and being in the company of people that she did not know, be an example of the lack of ability to protect herself that you're talking about?
>
> A. *I think it is very significant in this case.* Of – You know, of course, any of us could go and drink too much and end up at the wrong place at the wrong time. In this case, however, I feel it is profound in that – that event happened and that she lacked the insight, or concern or worry, when recollecting it, *she lacked the capacity to grasp how dangerous that situation and that behavior ultimately can be.* [Emphasis added.]

¶39    Sawicki added:

> A. . . . [M]ost poignantly, she had a basically, uh -- for lack of a better word, no performance on the -- the components of the mini mental status exam that test for reasoning and judgment, that is, if I can use our language, the serial sevens, proper interpretation and fact recall.
>
> These and other elements of this case lead me to believe that -- on a very functional level -- [A.K.] is unable to make healthcare decisions, she is unable to make decisions that will protect her life and health, and in fact I believe *she is at a high, high level of risk* because of her lower level of functioning on a – in a cognitive manner. [Emphasis added.]

¶40    Finally, Sawicki concluded with a statement that may have keyed off of defense counsel's definition of "overt act," but which nonetheless established the statutory requirements:

A. In this case, as I indicated to defense, honestly I cannot see any single overt act or omission. However, what I am very aware of is a *series of events and behaviors that when added up, in my opinion -- sum up to a very risky situation.*

*. . . [T]hat's what I'm seeing in this case. A series of behaviors, a course of conduct, a lack of judgment -- and that's my concern for [A.K.], is safety at this case – in this time.* [Emphasis added.]

¶41 A review of the entirety of Sawicki's testimony reveals that he clearly testified that A.K.'s "behaviors," "conduct" and "judgment" had placed her, because of her mental disorders, in a "high, high level of risk" and in a "very risky situation." It should be recalled that Sawicki also explained that A.K.'s defense mechanisms were "at a childlike level." Thus, A.K. was out of town, stranded, out of communication with her family, drinking heavily, in the company of people she did not know, with a childlike ability to care for herself. She was, in fact, far from home, lost and in danger—as a direct result of her mental conditions. Sawicki's testimony established that it was A.K.'s mental disorders which had placed her in an "imminent threat of injury," and that this threat was based upon her overt behaviors. The statute was thus satisfied and there was substantial evidence to support the District Court's findings.

¶42 The Court holds that the evidence here was not sufficient to establish an "imminent threat of injury" which would allow the State to act. To the contrary, A.K. was a half step away from a tragic injury or outcome. It was imminent—"a high, high level of risk." Requiring evidence which establishes a still greater "imminent threat" than existed in this case is not only unnecessary under the statute, but may well tie the hands of the State until it

16

is too late to prevent tragedy.  After that tragedy occurs, we will no longer debate whether the

threat was imminent enough for the State to intervene.

¶43    I would affirm the District Court.


                                        /S/ JIM RICE