# IN THE MATTER OF THE MENTAL HEALTH OF: O.R.B., Respondent and Appellant.

No. DA 07-0338.
Submitted on Briefs April 9, 2008.
Decided August 20, 2008.
2008 MT 301.
345 Mont. 516.
191 P.3d 482.

For Appellant: **Jim Wheelis**, Chief Appellate Defender, **Roberta R. Zenker**, Assistant Appellate Defender; Helena.

For Appellee: **Hon. Mike McGrath**, Montana Attorney General, **Michael S. Wellenstein**, Assistant Attorney General; Helena; **Larry**

**D. Epstein**, Glacier County Attorney; Cut Bank.

JUSTICE RICE delivered the Opinion of the Court.

¶1 Appellant, O.R.B. appeals from the order of the Ninth Judicial District Court, Glacier County, committing her to the Montana State Hospital at Warm Springs. We affirm.

¶2 We consider the following issues on appeal:

¶3 1. Did the District Court err by failing to secure an appointed "friend" for O.R.B.?

¶4 2. Did the District Court make a sufficiently detailed statement of facts to support its findings as required by § 53-21-127(8)(a), MCA?

¶5 3. Are the District Court's findings of fact numbered 14 and 17 clearly erroneous?

¶6 4. Does the omission of recommendations in the professional person's written report constitute reversible error?

### FACTUAL AND PROCEDURAL BACKGROUND

¶7 On April 27, 2007, the Glacier County Attorney filed a petition alleging that O.R.B. suffered from a mental disorder requiring commitment, specifically "Schizophrenia" and "suicidal ideations." Filed with the petition was a report by Karen Baumann from the Center for Mental Health, stating that O.R.B. appeared delusional and often had "audio hallucinations." At the probable cause hearing, Dr. Randy Webb, M.D., of the Northern Rockies Medical Center, explained that O.R.B. had fractured her ankle in February and refused an evaluation by the orthopedic surgeon. She was instructed then not to bear weight on the leg, but when she had visited the hospital she had walked through snow and the cast was wet. Dr. Webb testified that O.R.B. "wasn't taking proper care of her leg, and that's why she was admitted to the hospital." Dr. Webb stated that O.R.B. appeared malnourished and that she was "not taking care of herself and seeing to her medical issues ... as a result of her current mental status" and needed "in-patient treatment." Dr. Webb opined that O.R.B.'s neglect to her leg could become "life-threatening." His testimony included evidence of suicidal ideation by O.R.B. Dr. Webb read from O.R.B.'s chart:

> On 4-19-07, the patient refused to take the evening dose of her medication. She stated to the nurse: "It is not for brain concussion. I can't stop the beating, pulsing in head." When relaxed [O.R.B.] became really upset and in a raised voice said: "I'll not leave in this condition, I'll kill myself in this condition." [O.R.B.] was pounding on her forehead and had her hands to her

throat and yelling: "Cut throat, cut throat." [Grammar and punctuation changes omitted.]

The court determined that there was probable cause, pursuant to § 53-21-124, MCA, for the filing of the petition and that an emergency existed requiring O.R.B.'s detention for her protection. The District Court appointed Virginia Villemez as a friend for O.R.B. and ordered Dr. Webb to complete a mental status examination of O.R.B. and provide the court with a written report.

¶8 A commitment hearing was held May 4, 2007. A friend for O.R.B. did not appear and the County Attorney explained that there was a problem securing a friend for O.R.B. because "those who have tried to assist her and help her have been accused of various acts against her person, and no one in the community, unfortunately for the community and the Respondent, has been willing to continue to assist her[.]"

¶9 Dr. Webb testified at the commitment hearing that during his "interview with [O.R.B. he] had found that she displayed delusional thoughts and paranoid thinking. She had a flit of ideas and disorganized thoughts, and did not appear to be in touch with reality." Dr. Webb also stated that O.R.B. "has a very delusional scheme that people are transmitting some type of ultrasonic waves through her home that's causing problems with her brain. [O.R.B.] described it as a brain concussion."

¶10 Dr. Webb also testified about O.R.B.'s living situation, saying "[s]he is living without heat in Cut Bank, Montana; she is living without proper sanitary facilities, without proper food and nutrition, and I think she is at risk for developing a physical illness that will cause her to have a shortened life span." Pertinent to O.R.B.'s living situation was Cut Bank Chief of Police, Jason Abbott's testimony. Officer Abbot stated:

> I have been to a lot of houses, and this house was absolutely the worst house I have ever been to. All the cupboard doors were taken off, the floor was completely covered in papers, legal papers and newspapers, and there was garbage covering the entire kitchen floor and there was absolutely no where to walk; and there was no heat, this was in winter, and there was no heat in the house.
>
> ....
>
> There were chicken bones mixed in with the papers all over the kitchen floor.
>
> ....
>
> It was a foul smell. The smell of–a body smell and garbage smell.

Also pertinent to O.R.B.'s welfare, Dr. Webb discussed O.R.B.'s nutrition, describing O.R.B as anorectic, explaining that "she's not eating, she's thin, and has decreased the amount of muscle and fat tissue in her body. She has very poor dentition. Her teeth are decayed and have not been properly maintained." It was Dr. Webb's medical opinion that with psychiatric assistance and proper medication, O.R.B. could eventually positively function within the community.

¶11 Dr. Charles Ellis, a psychiatrist at the Montana State Hospital also testified at the commitment hearing. It was Dr. Ellis' diagnosis that O.R.B. suffers from "paranoid schizophrenia." He stated that:

[W]ithout psychiatric treatment [O.R.B. is] not going to agree to proper medical care, and if we don't clear up her paranoia then she's going to do herself a lot of damage, especially when she's already broken her ankle and not taking proper care of it, and the longer we let her go in this state the worse she's going to be physically. And the other thing with schizophrenia, the longer you leave it untreated the longer it damages the brain and the longer it takes to get a person back to normal functioning, so the longer we leave her like this, the more of a dis-service we're doing to her.

Dr. Ellis opined that O.R.B. was putting herself in "imminent danger." O.R.B, however, testified that she did not have a mental illness but rather her neighbors "pulse pressure to [her] house" and "damaged [her] brain[.]"

¶12 Concluding the hearing, the District Court made detailed oral findings of fact, discussed below, and ultimately concluded that O.R.B. "suffers from the mental disorder of psychosis, with paranoid delusions." The court concluded that because of O.R.B's mental disorder, O.R.B. was "not able to provide for her own basic needs of food, clothing, shelter, health or safety, and that without treatment she's in imminent danger of self-injury ...." A dispositional hearing was set for May 9, 2007.

¶13 At the dispositional hearing, the District Court incorporated its prior findings made at the commitment hearing and committed O.R.B. to the Montana State Hospital at Warm Springs for a period of not more than ninety days. The court noted that "[b]ased on Dr. Webb's testimony, as well as Dr. Ellis', there [were] no alternatives for treatment other than the State Hospital." The District Court entered its written findings of fact on May 9, 2007. Pertinent to this appeal are the following findings:

14. The Respondent's conditions are such that she is an imminent danger to herself.

....

17. The Court finds beyond a reasonable doubt that the Respondent is a danger to herself and it [sic] not able to provide for her own food, clothing, health, and welfare.

O.R.B. appeals.

## STANDARD OF REVIEW

¶14 In an involuntary commitment case we review a district court's findings of fact to determine whether, upon viewing the evidence in the light most favorable to the prevailing party, the findings are clearly erroneous. *In re G.M.*, 2007 MT 100, ¶ 12, 337 Mont. 116, ¶ 12, 157 P.3d 687, ¶ 12. We exercise de novo review when deciding questions of law such as whether the district court correctly interpreted and applied relevant statutes. *In re Mental Health of E.P.B.*, 2007 MT 224, ¶ 5, 339 Mont. 107, ¶ 5, 168 P.3d 662, ¶ 5.

## DISCUSSION

¶15 **1. Did the District Court err by failing to secure an appointed "friend" for O.R.B?**

¶16 O.R.B. contends that the District Court erred by failing to appoint a "friend" to assist her during the involuntary mental health commitment proceedings as required by § 53-21-122(2), MCA. O.R.B. argues that "strict compliance with involuntary mental health commitment statutes" is required, making reversal appropriate because the court did not secure a friend for her. The State asserts that the court initially appointed a friend but that it became apparent that no one was willing to serve as friend for O.R.B due to her conduct. The State argues that O.R.B.'s conduct resulted in the court's inability to secure her a friend and she cannot now "take advantage of the fact that no one in the community was willing to assist her due to her psychosis and behavior."

¶17 ■ Pursuant to § 53-21-122(2), MCA, upon a petition for commitment, "[t]he judge shall appoint a professional person and a friend of respondent and set a date and time for the hearing on the petition ...." Section 53-21-102(8), MCA, defines "friend of respondent" as "any person *willing* and able to assist a person suffering from a mental disorder and requiring commitment ...." (Emphasis added.) Here, at the probable cause hearing the District Court appointed Virginia Villemez as friend for O.R.B. However, at the commitment hearing it was disclosed that there was difficulty in maintaining a friend for O.R.B. because O.R.B. accused persons trying to help her

with "various acts against her person," making others unwilling to assist her. We conclude that the court's initial appointment of a friend for O.R.B. satisfies § 53-21-122(2), MCA, which contemplates that appointment of a friend is dependent upon a person's willingness to serve in that capacity. "The law never requires impossibilities," § 1-3-222, MCA, and it would be fundamentally unfair to fault the District Court for failing to secure a person to act as O.R.B.'s friend where no person was apparently willing to do so.

¶18 **2. Did the District Court make a sufficiently detailed statement of facts to support its findings as required by § 53-21-127(8)(a), MCA?**

¶19 O.R.B. contends the court violated § 53-21-127(8)(a), MCA, by making generalized findings of fact that are "[m]issing ... any detail about the conduct and symptoms that support the diagnosis." O.R.B. attempts to compare the instant case to our decision in *In re A.K*, 2006 MT 166, 332 Mont. 511, 139 P.3d 849, asserting that the findings of fact here "involve the same legalese in reference to an unspecified 'imminent danger of injury,' or reference to testimony." The State argues that O.R.B.'s reliance on *In re A.K.* is unpersuasive and the District Court provided sufficient findings of fact both in writing and during the May 4, 2007, commitment hearing.

¶20 Section 53-21-127(8), MCA, requires that "[i]n ordering commitment pursuant to this section, the court shall make the following findings of fact: (a) a detailed statement of the facts upon which the court found the respondent to be suffering from a mental disorder and requiring commitment[.]" In *In re A.K.* the district court set forth four brief findings of fact related to A.K.'s mental disorder requiring commitment. *In re A.K.*, ¶ 14. The court concluded that the brief and conclusory "findings ... [did] not satisfy the statutory mandate." *In re A.K.*, ¶ 14. Here, the District Court included nineteen detailed findings of fact in its written order of commitment. Each finding is supported by evidence presented at the commitment hearing. A review of the record in the instant case presents far more detailed findings of fact than other cases, such as *In re A.K.*, where we concluded that the statutory requirements were not satisfied.

¶21 Moreover, the court orally detailed its findings at the conclusion of the commitment hearing. In fact, the commitment hearing transcript contains four pages where the court meticulously reviewed the testimony received in support of each finding of fact. A brief excerpt of the transcript demonstrates the impressive amount of detail the court used to present its findings:

The Court makes the following findings of fact: Pursuant to 53-21-126, first of all; the court heard from Dr. Randy Webb, who performed a mental status evaluation, and he found that she had delusional thoughts and paranoid thinking, disorganized thinking, and did not appear to be in touch with reality. She–Dr. Webb testified additionally, she had not been maintaining a proper diet; her living conditions put her at risk. He specifically articulated that there was a fracture to her ankle in February, which was not–she did not follow through with the treatment recommendations adequately. Her personal hygiene and cleanliness presented a potential for risk to [O.R.B.] in the area, of infection. Dr. Webb testified that her physical condition stems from her mental disorder, that resources are available to help her within the community, but that she refuses to take advantage of those resources. Dr. Webb testified that, and the court accepts that, the least restrictive setting which would be appropriate for [O.R.B.] would be at Warm Springs, at the State Hospital in Warm Springs; that the county does not have any facility that could accommodate the needs of the Respondent. And I believe his final diagnosis was psychosis, with paranoid ideations. He stated that with a reasonable degree of medical certainty. Dr. Webb indicated that the Respondent has decreased muscle tone and poor dentition. She had not been taking food of a nutritional nature, and would not agree to a blood test which would allow a more complete and further diagnosis. Left untreated, Dr. Webb testified that [O.R.B.'s] conduct created adequate risk of harm to herself, that she was not taking in an adequate amount of nutrition to sustain her over time.

Additionally, sometimes this type of behavior presents a risk for the heart, as well as other organs, which could potentially be damaged beyond repair.

The court continued to detail its findings, relying on the testimony of Dr. Ellis, Officer Abbott, and O.R.B. herself. The court found "to a reasonable degree of medical certainty that [O.R.B.] suffer[ed] from psychosis with paranoid delusions," was "a danger to herself," and "because of her mental disorder, is substantially unable to provide for her own basic needs ... plac[ing] herself at risk ...." We conclude that the requirements of § 53-21-127(8)(a), MCA, regarding the statement of facts were satisfied by the District Court.

¶22 **3. Are the District Court's findings of fact numbered 14 and 17 clearly erroneous?**

¶23 O.R.B. argues that the District Court's findings of fact numbered 14 and 17 are clearly erroneous because the testimony supporting these findings "describes merely the realm of potential dangers, rather than actual, imminent dangers stemming from overt acts." The State contends that the court's decision to commit O.R.B. was justified under the criteria set forth in § 53-21-126(1)(a) and (c), MCA.

¶24 Once a district court determines that the respondent suffers from a mental disorder, the court must determine whether the respondent requires commitment. Section 53-21-126(1), MCA. In determining whether the respondent requires commitment, the court considers the following:

> (a) whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health or safety;
> (b) whether the respondent has recently, because of a mental disorder and through an act or an omission, caused self-injury or injury to others;
> (c) whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions; and
> (d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to the others or will be unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety.

Section 53-21-126(1), MCA. "Commitment is justified if *any* of the criteria in § 53-21-126(1), MCA, are satisfied[.]" *In re A.K.*, ¶ 12 (emphasis added).

¶25 Here, the Court made two findings of fact that O.R.B. complains are clearly erroneous:

> 14. The Respondent's conditions are such that she is an imminent danger to herself.
>
> ....
>
> 17. The Court finds beyond a reasonable doubt that the Respondent is a danger to herself and [is] not able to provide for her own food, clothing, health, and welfare.

As previously discussed, the court's findings of fact are highly detailed and supported by the record. The court determined that O.R.B was unable to care for herself for several reasons, including her neglected

ankle fracture, inadequate nutrition, and the lack of personal hygiene and cleanliness. The court accepted Dr. Webb's medical opinion that O.R.B. may suffer irreversible organ damage if her behavior persisted. Accordingly, the court concluded that O.R.B. was a danger to herself and commitment was necessary to prevent O.R.B. from further harming herself. Contrary to O.R.B.'s argument, the District Court's findings of fact are not clearly erroneous merely because the court did not support its findings of fact with "proof of an overt act or omission sufficiently recent in time." The court's findings satisfy the requirements of § 53-21-126(1)(a), MCA, and support the necessary criteria. *In re A.K.*, ¶ 12.

¶26 **4. Does the omission of recommendations in the professional person's written report constitute reversible error?**

¶27 O.R.B. next argues that pursuant to § 53-21-123(1), MCA, the professional person must make a written report of his/her examination and if the report "recommends commitment then it *must* also contain recommendations for disposition." (Emphasis in original.) O.R.B. asserts that because Dr. Webb's written report did not include his "recommendations for disposition," the court failed to comply with the statutory requirements. O.R.B. claims error because (1) the court is not "skilled in psychiatry" and without a recommendation "the court has little to rely on" and (2) without recommendations O.R.B. had "no notice of what to prepare for."

¶28 The State concedes that Dr. Webb's written report did not contain recommendations, but asserts that Dr. Webb "fulfilled the statutory requirements by providing the district court with recommendations not only regarding O.R.B.'s commitment, but also O.R.B.'s disposition" at the May 4, 2007, commitment hearing. In response to O.R.B.'s contention that she was unable to prepare for the hearing, the State claims that O.R.B. raised no complaint in the district court and, in any event, the probable cause hearing "put O.R.B. on notice that Dr. Webb was likely to testify at the hearing that the district court should commit her."

¶29 We have held that "Montana's civil commitment laws are to be strictly followed." *In re Mental Health of A.S.B.*, 2008 MT 82, ¶ 48, 342 Mont. 169, ¶ 48, 180 P.3d 625, ¶ 48 (internal quotation omitted). O.R.B. relies on our decision in *Matter of R.M.*, 270 Mont. 40, 889 P.2d 1201 (1995), to assert that reversal is a necessary consequence of failing to strictly follow § 53-21-123, MCA. In *Matter of R.M.*, we held that the district court had erred because it failed to appoint a

professional person to assess R.M.'s mental health. *Matter of R.M.*, 270 Mont. at 45, 889 P.2d at 1204. Without a professional person's evaluation, the court's decision was based on "an examination of R.M. performed before the commitment proceeding was initiated, and by the very person who requested that the commitment petition be filed." *Matter of R.M.*, 270 Mont. at 45, 889 P.2d at 1204. Here, the court appointed Dr. Webb as the professional person to examine O.R.B. but unfortunately, Dr. Webb's written report did not include "recommendations" as required by § 53-21-123(1), MCA. O.R.B. contends that "[i]t matters little that the distinction between this case and *R.M.* is merely that the professional person here did not make recommendations as required."

¶30 Under the circumstances here, we conclude that the report error was *de minimus*. While we agree with O.R.B. that the District Court erred by failing to ensure that recommendations were in the written report, this error was harmless. *See In re A.S.B.*, ¶ 36 ("'[a] harmless error does not mandate that we reverse a district court judgment; an error must cause substantial prejudice to warrant reversal.'" (quoting *Matter of S.C. & L.Z.*, 2005 MT 241, ¶ 29, 328 Mont. 476, ¶ 29, 121 P.3d 552, ¶ 29)). Unlike *Matter of R.M.*, the court here complied with § 53-21-123, MCA, by appointing a professional person to evaluate O.R.B.'s mental health. Further, the court relied on Dr. Webb's professional testimony when considering O.R.B.'s commitment–a fact O.R.B. easily ignores when arguing that she was prejudiced because the District Court is not "skilled in psychiatry." In fact, when concluding the commitment hearing, the court clearly stated that it based its decision on the testimony of Dr. Webb and Dr. Ellis, both of whom testified that commitment at Warm Springs was the only viable option for O.R.B. Thus, the court's decision was based on the recommendations of the professional person and distinguishes the concerns expressed in *Matter of R.M.*

¶31 ▮ O.R.B. argues that she had "no notice of what to prepare for." The State notes that O.R.B.'s counsel never objected or complained that he was unaware of what the recommendation would be or unable to prepare for the hearing because the report did not contain recommendations. Dr. Webb testified at the probable cause hearing in April that O.R.B. required in-patient treatment, providing an early indication that a recommendation of commitment would be necessary. O.R.B. was then held under an emergency detention. Dr. Webb's report clearly set forth his belief that O.R.B. suffered from a serious disorder. Thus, the testimony at the initial hearing, O.R.B.'s emergency

detention, and the written report's conclusions were together sufficient to put O.R.B. "on notice" that the recommendation would be for her commitment. Although we do not condone the report error, and recognize that the error could potentially be prejudicial in other circumstances, we cannot conclude that Dr. Webb's oversight requires reversal here.

¶32 Affirmed.

CHIEF JUSTICE GRAY, JUSTICES WARNER, COTTER and MORRIS concur.