DA 19-0141

FILED

03/09/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0141

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 58N

IN THE MATTER OF THE
MENTAL HEALTH OF:

A.O.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DI-16-054(A)
Honorable Amy Eddy, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Kristen L. Peterson, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Damon Martin, Assistant
Attorney General, Helena, Montana

          Travis R. Ahner, Flathead County Attorney, Anne Lawrence, Deputy
County Attorney, Kalispell, Montana

                    Submitted on Briefs:  January 27, 2021

                                Decided:  March 9, 2021

Filed:

                _____
                            Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Appellant A.O. appeals an Eleventh Judicial District Court order committing him to the Montana State Hospital for a period not to exceed ninety days and authorizing the administration of involuntary medication for the purposes of transport. We affirm.

¶3 On January 9, 2019, A.O. created a disturbance at a Kalispell Costco store, requiring law enforcement intervention. Law enforcement transported A.O. to a local emergency room, but once hospital staff determined A.O. did not meet the requirements for an involuntary hold, they released him. That same day, after his release, A.O. got into an argument with his girlfriend and became aggressive towards his roommates, resulting in another law enforcement visit and another trip to the emergency room.

¶4 A.O.'s brother-in-law, Willie, informed the Certified Mental Health Person ("MHP") evaluating A.O. in the emergency room that A.O. has a long history of Bipolar Disorder and has previously been hospitalized about a dozen times. Willie stated that A.O. threw out his medications the previous day, claiming "Jesus is my therapist now," and that he "can't wait to be with Jesus." Willie was unable to confirm or deny if A.O. meant these statements to indicate suicidal ideation but told the MHP they worried him. Importantly,

Willie indicated that A.O. has had similar manic episodes before and that A.O. "[is] going to get violent" and may eventually black out.

¶5 The MHP attempted to speak with A.O., who confirmed he is manic depressive but said "that cross has been lifted" and that his mania is no longer a burden. When the MHP told A.O. he was being evaluated for an involuntary hold, however, A.O. stiffened, stating he would "take [the] hospital" should he be held against his will. He then began breathing heavily and stared down the MHP, who left out of concern for her safety. As the MHP left the room, A.O. stood up and screamed, "this is my hospital."

¶6 Based in part on the MHP's report, on January 10, Pathways Treatment Center admitted A.O. on an emergency detention hold. At Pathways, A.O. demonstrated increasing paranoia and "hyper-religiosity." A.O. soon became violent and started pounding on the walls and windows of a nurse's station. He also threatened to kill "every person he saw" and said that he would die trying to kill anyone who touched him. A.O. eventually broke the nurse's station window and attempted to crawl through it. Security and law enforcement responded—it took five officers, three security guards, and the use of a taser to finally restrain A.O.

¶7 The next day, Friday, January 11, the Flathead County Attorney's Office filed a petition to involuntarily commit A.O. Notably, the petition stated the county attorney could not find an appropriate person to serve as court-appointed "friend of [the] respondent" ("Friend"). *See* §§ 53-21-102(8), 53-21-122(2)(b), MCA. The District Court set an initial appearance for the following Monday, January 14, and an adjudicatory hearing for

January 17. At the initial appearance, A.O. appeared remotely from Pathways with his court-appointed attorney alongside him. While being advised of his rights, A.O. became "very agitated" and started "screaming at the judge" and his counsel. Fearing for her safety, A.O.'s counsel left the room and waived the remainder of the initial appearance, though counsel apparently stayed in contact with the District Court. Before the proceedings concluded, the State moved to have A.O. transported to the Montana State Hospital pending the adjudicatory hearing. The State represented that Dr. Todd Shumard, A.O.'s attending psychiatrist at Pathways, agreed with the transportation plan. A.O.'s counsel did not object, and the District Court granted the motion.

¶8      A few hours after the initial appearance, however, the State filed a motion requesting an expedited adjudicatory hearing and the involuntary administration of medication for A.O.'s safe transport. The State's reason for requesting the expedited hearing was that law enforcement refused to transport A.O. to the Montana State Hospital without sedation, and Dr. Shumard did not feel that Pathways—or any other community placement—had the necessary facilities to safely hold A.O. in his manic state. The District Court granted the motion and held the adjudicatory hearing the afternoon of January 14, mere hours after A.O.'s initial appearance. A.O. was not present at the hearing, either in person or via video; the record indicates his presence was waived by counsel beforehand.

¶9      At the adjudicatory hearing, Dr. Shumard testified that A.O.'s continued aggressiveness and agitation regarding the legal proceedings made it unsafe for Pathways staff to personally interact with him; that because of his manic state, A.O. had slept only

4

about three hours over the past three days; that A.O. consistently displayed delusional thinking, including "grandiose [] religious themes" such as "being the creator [and] destroyer of worlds or people"; and that A.O.'s violent outbursts rendered community placement dangerous to both A.O. and others. Dr. Shumard believed bringing A.O. to the courthouse would seriously affect his mental state and his safety. In Dr. Shumard's opinion, placement at the Montana State Hospital was the only viable option available. Placement there would ensure not only the safety of the public and hospital workers but of A.O. as well—A.O. continued to be violent and in his manic state did not have the necessary cues to take care of or feed himself. Dr. Shumard expressed that immediate commitment was necessary because he did "not doubt [A.O.] will do damage to anyone else if [A.O.] is able to lay [] hands on them" and that based on his observations and statements from A.O.'s family, A.O.'s condition is likely to deteriorate further and would improve only with medication.

¶10 Kimberly Olson, a licensed clinical professional counselor, also testified regarding her interactions with and observations of A.O.; her testimony corroborated Dr. Shumard's observations and placement recommendations. On cross-examination by A.O.'s attorney, Olson agreed that waiving A.O.'s presence at the hearing was in his best interest. A.O.'s counsel did not ask either witness any other questions and called no witnesses on A.O.'s behalf. No Friend for A.O. was either present at the hearing or appointed by the Court. After Olson's testimony, the State recommended that A.O. be transported to Montana State

Hospital for commitment; A.O.'s counsel did not challenge the State's recommendation and left the decision up to the court's discretion.

¶11 The District Court found that A.O. suffers from a serious mental disorder, Bipolar Disorder, and that because of that disorder A.O. is unable to provide for his basic needs and safety. Further, the District Court found that because of his disorder A.O. has already caused self-injury or injury to others, and there is an imminent continued risk of further injury either to A.O. or to others. The court finally found that A.O.'s mental disorder will predictably deteriorate if he does not receive adequate treatment. The District Court acknowledged that pursuant to § 53-21-122(2)(a), MCA, an adjudicatory hearing "may not be held on the same day as the initial appearance," but it reasoned that the word "may" instead of "shall" allowed some discretion given the exigent circumstances present. The District Court finally noted that law enforcement refused to transport A.O. unless he was medicated and that the court cannot order involuntary medication prior to an adjudication and disposition. The District Court therefore ordered A.O.'s commitment to the Montana State Hospital for a period not to exceed ninety days and authorized involuntary medication for the purposes of transport.

¶12 On appeal, A.O. argues that the District Court erred in concluding A.O.'s right to be present at his commitment hearing was validly waived and in holding the adjudication hearing on the same day as A.O.'s initial appearance. "Due process claims in involuntary civil commitment cases are subject to plenary review"; we examine the civil commitment order to determine if the "district court's findings of fact are clearly erroneous and its

6

conclusions of law are correct." *In re S.D.*, 2018 MT 176, ¶ 8, 392 Mont. 116, 422 P.3d 122 (citations omitted).

¶13    A.O.'s counsel did not object to any of the District Court's actions. We generally do not address issues raised for the first time on appeal; but due to the nature of involuntary commitment proceedings, we may use plain error review to address unpreserved issues. *See In re M.K.S.*, 2015 MT 146, ¶ 13, 379 Mont. 293, 350 P.3d 27. A.O. thus has the burden to demonstrate (1) that the alleged error implicates a fundamental right and (2) that failure to review the alleged error would result in "a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." *In re M.K.S.*, ¶¶ 13-14 (citations omitted). Under the second prong of this test, we "weigh the risk of depriving an individual's liberty against the probable values of the procedure in question." *In re B.H.*, 2018 MT 282, ¶ 17, 393 Mont. 352, 430 P.3d 1006 (quoting *In re M.K.S.*, ¶ 18). "When a procedural error results in no substantial prejudice to the party, the error is *de minimis* and does not affect [the] individual's liberty interest." *In re B.H.*, ¶ 17 (quoting *In re M.K.S.*, ¶ 18); *see also In re Mental Health of O.R.B.*, 2008 MT 301, ¶ 30, 345 Mont. 516, 191 P.3d 482; *In re Mental Health of A.S.B.*, 2008 MT 82, ¶ 36, 342 Mont. 169, 180 P.3d 625.

¶14    "We have consistently emphasized that our civil commitment laws are to be strictly adhered to." *In re M.K.S.*, ¶ 16 (citation omitted). "The statutes authorizing involuntary commitment are to be applied to ensure that the government does not invade an individual's

freedom or liberty without due notice, cause and process." *In re M.K.S.*, ¶ 16 (internal quotation and citation omitted). We have, however, declined to reverse for lack of strict compliance with these statutes where we conclude that the second prong of the plain error review standard is not met. *In re B.H.*, ¶ 20 (citing *In re M.K.S.*, ¶ 24).

¶15 A.O. contends that, because he was not appointed a Friend pursuant to § 53-21-122(2)(b), MCA, the District Court erred in concluding a valid waiver of his physical presence at the adjudicatory hearing under § 53-21-119(2), MCA, existed. Section 53-21-119(2), MCA, in relevant part reads:

> (2) The right of the respondent to be physically present at a hearing may also be waived by the respondent's attorney and the [Friend] with the concurrence of the professional person and the judge upon a finding supported by facts that:
> (a)     (i) the presence of the respondent at the hearing would be likely to seriously adversely affect the respondent's mental condition; and
>
> (ii) an alternative location for the hearing in surroundings familiar to the respondent would not prevent the adverse effects on the respondent's mental condition.

¶16 The record is clear that the District Court did not appoint A.O. a Friend, and therefore the District Court erred in concluding A.O.'s right to be physically present at the adjudicatory hearing was properly waived under § 53-21-119(2), MCA. A.O.'s attorney, however, waived his appearance, and multiple medical professionals and the District Court all concurred, based on findings supported by the record, that § 53-21-119(2)(a), MCA's, conditions were met. Our review of the record leads us to conclude that A.O.'s due process rights were not substantially prejudiced by the absence of a Friend. Given his medical history, Dr. Shumard's testimony, and the severe and obvious threat he posed to himself

and others, there is no reasonable probability that any appointed Friend acting in good faith would have pushed for A.O. to be present at the adjudicatory hearing. In this case, therefore, the procedural value of having a Friend assent to the waiver of physical presence is minimal; any error by the District Court was *de minimis* and does not affect A.O.'s liberty interest. *See In re B.H.*, ¶¶ 22-23; *In re M.K.S.*, ¶¶ 20-23.

¶17 A.O. next argues that the District Court plainly erred when it held the adjudication hearing on the same day as his initial appearance. Section 53-21-122(2)(a), MCA, reads in relevant part that "[t]he judge shall . . . set a date and time for the hearing on the petition [for involuntary commitment] that may not be on the same day as the initial appearance." Before the State moved for an expedited adjudicatory hearing, law enforcement represented that, despite the District Court's order, they would not transport A.O. to the Montana State Hospital without the use of involuntary sedative medication. Attached to the State's motion was a letter from Dr. Shumard, stating that due to A.O.'s condition A.O. was a continuing threat to himself and others, could not safely remain at Pathways, and required medication to return to a functioning level. A.O.'s counsel did not object to the motion and agreed that it was not safe for A.O. to remain at Pathways until the originally scheduled January 17 hearing.

¶18 We do not accept the District Court's reasoning that the word "may" in § 53-21-122(2)(a), MCA, provides some level of judicial discretion when it says the court "may *not*" hold the hearings on the same day. On the record before us, however, we cannot conclude that the District Court's error substantially prejudiced A.O. The uncontroverted

9

testimony of medical professionals indicates that without medication, A.O.'s condition would continue to deteriorate. A.O. already had made threats on the life of Pathways staff; breaking and attempting to crawl through the nursing station window demonstrated a dangerous level of sincerity to those threats. Seven guards and law enforcement officers and the use of a taser were required to restrain A.O. His manic state resulted in an average of one hour of sleep per day, and he was refusing to eat or take voluntary medication. Finally, A.O. was unable to safely or effectively communicate or interact with the District Court, his counsel, or Pathways staff.

¶19    These facts indicate that A.O.'s then-existing mental condition would not have allowed a more effective defense to the commitment petition by the passage of time between his initial appearance and adjudicatory hearing. On the contrary, there is substantial evidence that A.O. had little to no awareness of his own health or safety at the time and posed a dangerous risk to himself and to others absent medication—which he refused to voluntarily take. As the District Court correctly observed, the only statute allowing an order for involuntary medication is in the provisions for post-trial disposition. Section 53-21-127(6), MCA. Further, it is unlikely A.O.'s counsel could have rendered any other effective aid through additional evaluations or consultation with A.O. due to his violent outbursts and inability to effectively communicate. Holding the adjudicatory hearing at a later date had little value when it was clear that his manic condition would not improve without medication. Weighing the risk of depriving A.O. of his liberty against the "probable value" of the prohibition against a same-day adjudication hearing,

*In re B.H.*, ¶ 17, we conclude that delaying the hearing would not have made a substantive difference in A.O.'s ability to defend but would have posed a very real risk of additional harm, both to A.O. and to others. We therefore conclude that the District Court's error did not affect A.O.'s substantial liberty interest. *See In re B.H.*, ¶¶ 22-23; *In re M.K.S.*, ¶¶ 20-23.

¶20 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent. Despite the irregularities present, a review of the record and of the District Court's actions leaves us with the firm conviction that A.O. was not subjected to a manifest miscarriage of justice and that the proceedings were fundamentally fair and did not undermine the integrity of the judicial process. The District Court's order committing A.O. to the Montana State Hospital for a period not to exceed ninety days and authorizing the administration of involuntary medication is affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON